# Neel *versus* Neel.

1. A tenant for life of land having coal mines opened on it, may mine the coal not only for his own use but also for sale.
2. He may also cut timber on the land for use in his mining operations.

ERROR to the District Court of *Allegheny county.*

It was a bill filed at the instance of Archibald Neel *v.* John Neel, and Grizella his wife, and others, to November Term, 1847.

[Neel *v.* Neel.]

The bill set out that the title of both parties arose under the will of Thomas Neel, who died in 1829. Grizella Neel, the wife of John Neel, had a life estate under his will. She was the widow of Thomas Neel. She entered upon the premises under the devise, and afterwards intermarried with John Neel, one of the parties to whom the remainder was limited, to take effect upon the death of Grizella Neel. That Archibald Neel is also one of the parties to whom the remainder is limited. The clauses in the will under which the controversy arose are as follows: "I do bequeath as follows to my dear wife: I give and bequeath my right and title of the landed property on which I live, &c. The landed property bequeathed to my wife during her lifetime, and at her death to fall back to my blood relations, my brothers and sisters." The tract of land devised lies adjacent to the Monongahela river, and is accessible through land owned by John Neel and others, lying immediately in front of the same, and between the land devised and the river. During the life of Thomas Neel a coal pit was opened on the part of the tract remote from the river, and worked for family use and for the benefit of the neighbors; but it was alleged that a very inconsiderable quantity of coal was excavated. Thomas Neel cut and sold timber to some extent on the land.

It was alleged, that after the intermarriage of John Neel with Grizella, he entered into contracts for the erection of railways on his own land, and the opening of two coal pits on the same, leading in the direction of and entering the breast of coal in the land devised to Grizella for life, and by himself and others excavated and sold a large quantity of coal, and is still continuing the excavation and sale, under the pretence that he is entitled to the same under the devise, and avers that he intends to continue said excavation. The coal underlies the tract in its whole extent, and is of great value, there being not less than one hundred acres of the same. Under the same pretence, John Neel has sold, wasted, and destroyed a large quantity of valuable timber.

The complainant alleged that the acts of the defendants amounted to waste; that they are destructive to the interests of those in remainder. That the tenant for life has no right to open *new* pits, and work them for the purposes of sale, and has no right to cut timber to a greater extent than is necessary for the improvement of the farm and the purposes of agriculture.

The complainant prayed for an account, and injunction to stay further working of the pits and cutting of timber; for an apportionment according to the relative interests of the parties; and for an injunction against any acts of the defendants that would interfere with such apportionment; and for general relief.

John Neel, the respondent, denied that he entered exclusively in right of his wife under the devise in Thomas Neel's will, but that he claims title to said lands in his own right, and denied that complainant has any title to said tract. He also admitted that

siderable timber on it at the decease of Thomas. But he alleged that two coal pits were *open* on the land in the lifetime of said Thomas; that one of said pits, to wit, that on the rear of the farm, was used for every practical purpose by the said Thomas. He took fuel from it for his own use, hauled it away and sold it to the neighborhood to a large extent, and used it for burning lime, &c.

He also alleged that the other pit was open on the river at the time of his marriage, and he believes had reached the land of Thomas through the land held by Crawford before the decease of the said Thomas. He further alleged that the coal, taken from said lands by himself or tenants under the devise to his wife, was all taken from the same vein or stratum which was opened and in use by the said Thomas Neel. The quantity taken by one tenant for sixteen years past, when he made his first lease with him, is stated by the tenant at about 100,000 bushels per annum. The lease with the other tenant commenced in 1839, and he has taken out also about 100,000 bushels per annum, but a large proportion of this coal was taken from the coal bank on the river lots, the property of John Neel alone. That a large body of coal, more than half the tract, remains untouched.

He also alleged, that much of the best timber on the tract was cut and sold by Thomas Neel in his lifetime, and though the respondent has used a good deal of it for the purposes of the farm, that a large part of it is yet standing on the premises. He averred that the timber taken by him and tenants was for fencing and building on the farm, and for props for the coal pits, and that no part of it was ever sold or removed from the premises.

Lowrie, J., decreed, that the complainant was not entitled to injunction, account, or the relief prayed for, and an appeal from the decree was taken.

The exceptions taken to the decree were as follows:

1. That tenant for life has no right to open new pits on the tract; and if he has, has no right to work them except for his own use and for the uses to which the original pit opened by the testator was worked.

2. That if entitled to open new pits and work them for the purposes of general sale, that the plaintiff is entitled to a decree that the subject-matter be referred to a Master to ascertain the relative value of the respective interests of the tenants for life and those in remainder, and to have the same apportioned, and for an injunction prohibiting the tenant for life from going beyond the apportionment.

3. That he is entitled to an account for the general purposes of his complaint, and for the additional purpose of ascertaining whether the respondents have not already excavated an amount

[Neel *v.* Neel.]

whether the respondents have not already excavated an amount of coal beyond the amount to which they would be entitled under an equitable apportionment.

4. To similar decrees in relation to the timber.

5. To such other relief as in equity, good conscience, &c., he ought to have.

*Woods, Shaler,* and *Stanton,* for complainant.—Chancery will interfere where the tenant affects the inheritance in an unreasonable and unconscientious manner, even though the tenancy be without impeachment of waste: 4 *Kent* 78; 3 *Atk.* 94; 2 *Vern.* 738; 2 *Bro.* 138, Tracy *v.* Hereford; 1 *Johns. Ch.* 11. By such a bill future waste may be prevented, and an account and compensation decreed for past waste.

At common law, and by the statute of Gloucester, *tenant for life* could neither cut timber nor mine coal. But the American doctrine is more enlarged: 4 *Kent* 76. But still the tenant cannot seriously impair the inheritance. The relative rights of the tenant for life, and those entitled in remainder, are to be determined from the nature and condition of the estate, and the circumstances of the parties. Whatever is prejudicial to the inheritance is waste: 7 *Johns.* 227; *U. S. Dig.* "Waste," 640, No. 19; *Id.* 925, § 19; 3 *Wend.* 341; 2 *Hill's Ch.* 277.

*McCandless* and *Hepburn,* for defendants.—The devise in this case was not simply a devise of real estate for life, but the testator gave his widow all "his right and title" for her life. She was a tenant for life without impeachment of waste. But the material question is, whether it is waste in a tenant for life to work open mines. The testator used the coal for domestic use and for sale so far as it was marketable. There is no restriction in the will with regard to the use of the coal. The rule is, that the working of open mines by the tenant for life is not waste: *Co. Litt.* 53 b; Sander's case, 5 *Co.* 12; 7 *Com. Dig.* 667, "Waste," D. 4; 3 *Am. L. J.* 328, Jan. 1851; 2 *P. Wms.* 389; 1 *Taunt.* 403. A widow may work mines or coal pits on her dower lands: 1 *Vern.* 218; 2 *Ch. Cas. Ab.* 160; 6 *Mun.* 134.

As to cutting timber, was cited 3 *Yeates* 261; 7 *John. Rep.* 227; 2 *Hayward* 110; *Id.* 283, that cutting wood for a furnace is not waste; 2 *Southard* 552; 1 *Green's Ch.* 469. No injury has been done to those entitled in remainder, by the cutting of timber.

An account cannot properly be demanded unless there is waste.

The case was affirmed on the opinion delivered by LOWRIE, J., in the District Court, which was as follows:—

It is insisted that the devise to the widow of the "right and title" of the land during her life, is something more than an ordi-

[Neel *v.* Neel.]

nary life estate, and that the widow has a right to exercise as full control over the land, the mines within it, and the trees upon it, during her life, as the testator himself could have done, restrained only *boni viti arbitratu*, and that she is not impeachable for waste in the exercise of any proper discretion as to the use of the land.

This is perhaps the distinction of the civil law, wherein the rights of the usufructuary and the farmer (colonus) are very different. The usufructuary had a right to seek for and open every kind of mines, stone and lime quarries, chalk pits, and gravel banks, if he did not thereby occupy a necessary part of the fields, and did no injury to the culture of the ground : *Dig.* 7, 1, 13, 5.

And this would seem to be not inconsistent with the ancient common law of England, for by it, tenants for life and years were without restraint for waste, as we find in all the early books from *Doctor and Student* 102, 3, 7, 13, downwards; 2 *Inst.* 299, 5 *Co.* 13 b, 4 *Co.* 626, 6 *Co.* 43 a, 3 *Com.* 483.

They were first made liable for waste by the statute of Marlborough, 52 Hen. 3, cap. 23, s. 2. But this statute applies in its terms to *farmers* only, who are lessees rendering rent. This statute is not reported to be in force in Pennsylvania. But the statute of Gloucester, 6 Ed. 1, c. 5, is. Yet this would seem to be intended only to furnish a more adequate remedy for the wrongs declared by the statute of Marlborough : *Rob. Dig.* 9 ; 1 *Cruise Dig.* 135.

Looking therefore at the old common law and the statutes in alteration thereof, the argument of the defendant's counsel would seem to be not without plausibility. But when we turn to the decisions on the subject, we do not find that any such distinction is made between lessees for life, and other tenants for life. All the English authorities treat the subject as if the statutes extended to all kinds of tenants, and this is taken for granted in Woodman & Good, 6 *W. & Ser.* 169.

And the old authorities, beginning with *Doctor and Student* 113, go upon the assumption that what is waste in one tenant is waste in another, on the maxim that " all cases like unto other cases shall be judged after the same law as other cases be." Yet in the modern cases there may be some distinction taken; the privilege allowed being more liberal to tenants for life, than to lessees for years. This is more clearly marked in the American cases, allowing tenants for life the privilege of cutting down timber in order to improve the land and fit it for cultivation. This, of course, increases the power and the profit of the tenant for life, and diminishes the control of the remainder-man. Yet this is subject to the rule of good husbandry, and does not violate the principle that the substance of the land is not to be taken away.

But as to all tenants for life, the rule has always been that the working of open mines of all sorts is not waste. The tenant for life has the usufruct of the whole land, and takes the whole profit

[Neel *v.* Neel.]

that can be derived from it in following out the use made of it by the donor. A nursery garden may be still used as such, though usually it is waste to sell trees and shrubbery. And the tenant for life is not at all limited by the extent of the use made of the property by the author of the gift. The law draws no such distinction, and we cannot follow the plaintiff's counsel in the view taken by them.

It seems in this case that the author of the gift had sometimes sold coal out of these pits, but I do not conceive this to be material. It is sufficient that he opened them and derived any profit from them, even if it were only *fire bote.* The fact of his opening the pits made the coal a part of the profits of the land, and the right to them will pass as such by a devise of a life estate. If he meant otherwise, he should have said so; not having said so, this is the legal influence of his intention. And on this subject there is no conflict in the decisions: 5 *Co.* 12; 1 *Brown* 241; *Cr. Eliz.* 683; (Sander's case,) *Co. Litt.* 54 b; 1 *Taunt.* 402, 409, 410; 2 *Beav.* 466, (Clavering *v.* Clavering,) 1 *P. Wms. 389,* and *Mosely* 219; 1 *Cowen* 460; 1 *Rand.* 258; *Styles* 68; 10 *Pick.* 460; 6 *Munf.* 124; 2 *Southard* 552; 2 *Green's Chan. Reps.* 469, Rutland's case, 1 *Lev.* 107; *Sid.* 152; 1 *Rep.* 557.

And the decisions refer to coal mines, gravel banks, clay pits, lead mines, iron mines, stone quarries, slate quarries, salt works, and the tenant for life may work them, even though the working of them may have been discontinued before the death of him through whom the estate comes: 1 *Taunt.* 410. And if necessary to the proper working of them, to make new openings in the ground; these are allowed, provided no unnecessary injury be done thereby: 1 *P. Wms.* 389; 1 *Rand.* 258; 10 *Pick.* 460; 6 *Munf.* 134.

The most obvious inference would seem to be, that when a man devises land with an open mine upon it, to a person for life, he intended the devisee to derive profit from the mine, as well as from the surface of the land. He may not have supposed that the devisee would exhaust the mine, and this might seem unreasonable. But when the donor did not see proper to restrain the gift, how. shall it be done? Surely courts have no such control over the arrangements which people choose to make of their affairs. Usually an enterprising tenant for life may be of advantage to the remainder-man, but in the case of mines it may be the reverse. And I cannot see how the enterprise of the citizen is to be restrained by judicial process. If we could get ourselves freer from the notions derived from feudal subordination, we would perhaps think that the privileges of tenants for life should be enlarged rather than restrained, and that the cultivation of the country would be thereby improved.

The only case I find that seems to favor the distinction insisted

[Neel *v.* Neel.]

on by the plaintiff, that the privilege is to use and not to sell, is a case in the *Year Books*, 17 Ed. 3, 7 *Vin. Ab.* "*Waste*" *H.*`pt.1.

Then as to the cutting of the timber, the plaintiff has lived close beside these works and for ten years has witnessed all that was going on, and I do not think that the loss of the timber used in carrying on the works has been the cause of his present tardy activity. I know that it has been said that a lease of mines does not give a right to timber to work the mines : Darcy *v.* Askwith, *Hob.* 234 ; *S. C. Hutt* 19 ; 2 *Bulst.* 279. But in cases of life estates in lands, with mines in them, the contrary has been held : 6 *Mun.* 134 ; 2 *South.* 552 ; 2 *Green's Ch. R.* 469.

I think therefore that we should not retain this bill, either on account of the coal or the wood, and it is dismissed. Bill dismissed.