## Roberts's Estate.

*Wills — Construction — Life-tenant and remainderman — Royalty — Dividends from coal mines.*

1. Corporate dividends payable to testamentary trustees, derived exclusively from royalties on coal taken from mines open at testator's death, as between life-tenant and remainderman, belong to the former.

2. Where testator, who had received corporate dividends from royalties for many years, directed his trustees to pay to his nephews and nieces the "interest, income and profits" of his residuary estate, to be retained in specie at the trustee's discretion, of which the stocks producing the dividends constituted a considerable part, the inference arises that he intended the life-tenants to receive as income the dividends which he himself had regularly received in his lifetime.

3. Shares of stock in coal companies which own coal mines and lease the same upon royalties, although wasting assets, become authorized investments where the trustees are directed to retain investments existing at testator's death, and, when so retained by them, dividends derived therefrom belong to the life-tenant, and not to the remainderman.

Exceptions to adjudication. O. C. Phila. Co., April T., 1917, No. 526.

The auditing judge (Henderson, J.) said in his adjudication:

"The trust in this estate arose under the will and codicil of Elizabeth C. Roberts, who died March 25, 1916, the provisions of which are hereinafter recited.

"This account was filed by the trustees so as to lay before the court for decision the question as to whether certain dividends received by the trustees belonged to the life-tenants or to the remaindermen, of whom several are minors, and for whom Robert Dechert, Esq., has been appointed guardian *ad litem*. This was not only the proper and safe course to pursue, but, there being a grave doubt as to their course of action, it was their duty to have this doubt removed and the question decided.

"The decedent was the owner of 407 shares of stock in the Cranberry Improvement Company, of 333 shares in the Highland Coal Company, and of 527 shares in the Union Improvement Company. All of these companies were incorporated in Pennsylvania and have the right to open and operate mines. . . .

"Dividends such as are now declared were for many years paid to the decedent in her lifetime and constituted about two-thirds of her income.

"Each of these companies owns a single coal mine which was open and operated in the lifetime of the decedent; none of these companies is engaged in coal mining; each leases its mine to others, from whom they receive royalties for the coal removed, and this constitutes their entire business. All the royalties in question were received for coal removed since the death of the testatrix. The lease of the Cranberry Company runs to 1936, and the other two run to the exhaustion of the coal. The royalties paid in 1916, at the time of the testatrix's death, were 41 cents, 28 cents and 30 cents; they are now 65, 42 and 40 cents.

"The total capital stock of the Cranberry Improvement Company is $440,000. The par value of the stock is $100 per share. This company has set aside at the present time (1922) assets consisting of securities of the value of $624,522. The total capital of the Union Improvement Company is $291,500. The par value of the stock is $25 per share. This company has set aside at the present time (1922) assets consisting of securities of the value of $504,189. The total capital stock of the Highland Coal Company is $480,000. The par value of the stock is $50 per share. This company has set aside at the present time (1922) assets consisting of securities of the value of $497,208.

Roberts's Estate.

"For United States income tax purposes, part of the royalties are assigned to a 'Depletion Reserve Account,' an appraisal of the corporations' coal on their lands having been made for this purpose.

"By the fourteenth item of her will the testatrix directed:

" 'I give, devise and bequeath unto my Executors hereinafter named and the survivors or survivor of them, all the rest, residue and remainder of my estate, real and personal, of which I shall die seized or possessed, or over which I may have power of appointment by virtue of my father's will, or any other manner, In Trust to collect and receive the income, interest and profits arising therefrom and to pay all proper and legal charges thereon or thereby incurred, and thereafter to pay therefrom the following:'

"Annuities (as modified by codicil) aggregating $8900 are then bequeathed, and she further provided:

" 'And to pay the remainder of the said income, interest and profits to my said sister, Frances Anna Roberts, in equal quarterly payments during her natural life. All of the said payments of income hereinabove provided for in this item shall be paid clear of all taxes and payments thereof and shall commence one year after my death; and from and after the death of my said sister, Frances Anna Roberts, In Trust, to collect the interest, income and profits from my said estate, and, subject to the payment of charges as aforesaid and of the annuities to my counsins, Annie J. and Elizabeth R. Thomas, and to my brother, G. Theodore Roberts, to pay one-half of the said interest, income and profits remaining to my niece, Elizabeth C. R. Wyatt, during her natural life, and upon the death of the said Elizabeth C. R. Wyatt, to pay the sum of Ten thousand dollars from the one-half of the principal from which she was entitled to the income during her life, to the Hospital of the Protestant Episcopal Church in Philadelphia, to be invested and held by the said Hospital and called 'The Algernon S. and Elizabeth C. Roberts Fund,' in memory of my parents, and to pay, transfer and deliver the balance of said one-half of the principal upon such uses, upon such estates, terms, conditions and limitations as the said Elizabeth C. R. Wyatt shall appoint and designate in writing, in the nature either of a deed· or of a will. If the said Elizabeth C. R. Wyatt shall die without having exercised the said power of appointment, ·then In Trust to receive, hold and pay the said balance of said· one-half of the principal to and for the uses and purposes, and subject to the conditions and limitations hereinafter set forth as to the income and principal of the other one-half of the said residuary estate for the benefit of my said niece, Frances Roberts Harrison, and my said nephews, Graham and Caryl Roberts.

" 'And as to said remaining one-half part of my residuary estate In Trust to pay the interest, income and profits therefrom and from any other portion of my said trust estate that under the previous terms of this will may lapse, share and share alike, in equal portions to my said niece, Frances Roberts Harrison, and to my said nephews, Graham Roberts and Caryl Roberts, and upon the death of my said niece or my said.nephews and either of them, leaving lawful issue, to use and pay the one-third share to which such deceased one would be entitled if living, for the maintenance and education of the lawful issue of such deceased one during minority, and In Trust to pay to each of the lawful issue of Frances Roberts Harrison, Graham and Caryl Roberts, his or her proportionate part of their respective parent's share of principal and accumulated income, upon his or her arriving at the age of twenty-one years. If either the said Frances Roberts Harrison or the said Graham and Caryl Roberts shall die without leaving lawful issue, then the share of the income of the one so dying shall be paid to the survivor or survivors thereof, or to

2 D. & C.

their respective lawful issue, such issue taking only their parent's share. If the said Frances Roberts Harrison, Graham and Caryl Roberts should all die without leaving lawful issue surviving each of them respectively at the time of his or her death, or if such issue, though surviving at the time aforesaid, shall all die before the distribution of the whole of the principal estate, as hereinbefore provided, then the said Executors and Trustees shall, in either of the events just mentioned, pay over the whole of the undistributed portion of the said principal estate to the said Elizabeth C. R. Wyatt, if she shall be then living, or, if she should not then be living, then they shall pay the said undistributed part of the principal in equal shares to the Hospital of the Protestant Episcopal Church in Philadelphia, to be added to 'The Algernon S. and Elizabeth C. Roberts Fund,' and to the Hospital of the University of Pennsylvania, the principal to be invested and the income to be used for the purpose of said Hospital.

" 'Item Fifteen. I direct that the following general provisions shall apply to all of the foregoing trust estates:

" 'I authorize my said Executors and Trustees and the survivors or survivor of them, to retain any or all of my investments existing at the date of my death, or in their discretion to change the same, to sell any of my securities or investments, and to reinvest the proceeds thereof and all other moneys coming into their hands in good investments, without limitation to so-called legal investments.'

"The question which I must now consider is, to whom do these cash dividends from the three companies belong?

"The title to them must be found in the will. The testatrix gives her residuary estate to her trustees, who are directed, out of the net 'income, interest and profits,' to pay certain annuities and then to pay the balance of the net 'income, interest and profits' to a sister, with a gift over of this balance to a niece, and upon her death she gives $10,000 'from the one-half of the principal from which she was entitled to the income' to the Episcopal Hospital, and the 'balance of the said one-half of the principal' as this niece may appoint. The remaining half of the net 'interest, income and profits' she gave to a niece and two nephews, with a gift over of their respective shares to their children, and then, upon each attaining his or her majority, 'to pay . . . his or her proportionate part of their respective parent's share of principal . . .' to each.

"The trustees are empowered to retain or change investments and are exonerated from legal investments.

"This leads to the inquiry, what did testatrix intend when she gave the life-tenants the remainder of the net 'interest, income and profits' from the residuary estate, having also empowered her trustee to retain her investments? I use the word 'net' because she directs the trustees first to pay 'all proper and legal charges' incurred.

"In this connection, it should be noted that the trustees are carrying these stocks at a value of about $96,000, while they are producing annual dividends of between $50,000 and $60,000.

"I shall assume that these dividends from wasting assets are other than ordinary cash dividends, which, under what is known as the 'Pennsylvania rule,' presumptively belong to the life-tenant, from Earp's Appeal, 28 Pa. 368, to McKeown's Estate, 263 Pa. 78. The question then arises, did the testatrix intend, by the use of the words 'interest, income and profits' accruing from wasting assets retained under a discretion in the will, that the life-tenants

should receive these dividends which I am now assuming are largely a distribution of *corpus?*

"This question must be approached from an interpretation of the will, and thereafter, if necessary, and only if necessary, from an inquiry as to the source of the dividends in question. . . .

"In Pennsylvania, the rule is that 'interest, income and profits,' standing alone, exclude the life-tenant from extraordinary dividends which decrease the *corpus*. In Boyer's Appeal, 224 Pa. 144-153, our Supreme Court, speaking through Mr. Justice Potter, said:

" 'And then, after all, the rule for the determination of controversies over dividends, between life-tenants and remaindermen, should be to give to each just what the donor intended each to have. As has been said, the intent of the grantor is the pole star for the guidance of the courts.

" 'The intent of the grantor here was that the 'dividends, income and profits' from the stock in trust were to go to the life-tenant. These terms are not necessarily coextensive or identical. It is to be presumed that the settlor meant to indicate by the use of these three words, 'dividends,' 'income' and 'profits,' pretty much everything in the way of advantage or benefit which might accrue from the stock, without decreasing the original value of the capital which it represented.'

"Were there nothing further in the will, I would be constrained to direct the valuation of these shares as of the date of the death of the testatrix, and award to the life-tenant interest at the prevailing rate for trust investments. See Lennig's Estate, 30 Dist. R. 320.

"By item fifteen of the will, however, the trustees were authorized 'to retain any or all of the investments existing at the date of my death, or in their discretion to change the same. . . .'" The trustees have exercised this discretion, and from the death of the testatrix in 1916 retained these wasting assets. The situation which confronts us, therefore, is the same as if she had directed the retention of these stocks. In this circumstance the guardian *ad litem* has urged Lennig's Estate as controlling. In that case, however, this question was not raised or argued, and, furthermore, the question as to whether the asset therein considered—an estate *pur autre vie*—was an investment within the terms of the will was also not raised or considered; I, therefore, feel free to consider the question as one of first impression.

"The testatrix having, in substance, directed the retaining of these stocks, and having given the income and' profits thereof to these life-tenants, I am of opinion that she gave the income and profits from these stocks in specie, and, hence, the life-tenants are entitled to take them.

"A similar question was discussed and decided in Re Bates, 1 Chancery, 22 (1907), although therein the securities were merely hazardous and not wasting in character. . . .

"In Gray *v*. Siggers, 15 Chancery Div. 74 (1880), there was also a clause in the will empowering trustees to retain any portion of the trust estate or to sell and invest it in their discretion. It was held that this power took the case out of the rule of Howe *v*. Earl of Dartmouth, 7 Vesey, 137, the court saying: 'I think he intended, if the trustees saw fit, that she should enjoy the property in specie, just as he himself was enjoying it.' See, also, In re Sheldon, 39 Chancery Div. 50 (1888) ; In re Thomas, 3 Chancery Div. 482 (1891) ; In re Wilson, 1 Chancery Div. 394 (1907).

"In re Nicholson, 2 Chancery Div. 111 (1909), is to the same effect, the doctrine being applied to wasting assets. See, also, In re Godfree, 2 Chancery Div. 110 (1914) ; In re Inman, 1 Chancery Div. 187 (1915). . . .

2 D. & C.

Roberts's Estate.

"The guardian *ad litem* replies to the foregoing authorities by citing several cases, which I will briefly consider.

"In re Chaytor, 1 Chancery Div. 233 (1905), there was no general gift of the income of the residue, nor any gift of income pending conversion, and the life-tenant was merely given the income from the proceeds of conversion. It, therefore, followed that, while the trustee had power to postpone conversion and retain securities, the life-tenant was only entitled to the income of them as if converted at the testator's death.

"In this connection, see, also, In re Wilson, 1 Chancery Div. 394 (1907).

" In Pickering *v.* Evans, 2 Chancery Div. 309 (1921), the will contained no authority to retain the securities in which the estate was invested, there being merely a direction to divide the estate at the termination of the trust, and it was held that this was not sufficient to take the case out of the rule in Howe *v.* Earl of Dartmouth.

"In Warrack's Trustees *v.* Warrack, 56 Scottish L. R. 472 (1919), the trustees were directed by the will to apportion the income received from wasting assets as between income and *corpus.* That case turned upon this unusual provision of the will.

"This case was also presented on the theory that while these dividends were derived from a sale or conversion of the *corpus* of the company, nevertheless, they should be regarded as income, because it was claimed they were within the exception to the general rule, which may be found well stated in 14 Corpus Juris, 830: 'But where the corporation is engaged in a business involving the consumption or change in form of its capital, a dividend made out of profits so earned is not a division of capital, but of income.'

"This exception is difficult of application and many cases have been brought to my attention involving it, some one way and some the other. Under the facts of this case, we undoubtedly have a 'consumption or change in form of its capital;' but we undoubtedly also have, under the facts in this case, a steady, slow liquidation of the assets.

"In my opinion, the real question is not whether there is a mere consumption of *corpus* or change of form in arriving at a dividend, but whether the company in question is conducting a business, the intent of which, at least, is the renewal of its capital through the ordinary business processes.

"In the view which I take of the instant case, it is not necessary to consider or apply this principle.

"I have reached the conclusion that this will gives these dividends arising from these stocks in specie to the life-tenants who are entitled to enjoy them.

"The questions herein presented are both interesting and intricate. Counsel have presented them with great skill and learning, and the briefs with which they have aided me are among the best which I have seen since coming upon this bench."

*Robert Dechert,* guardian *ad litem,* for the minor remaindermen, exceptant.
*Thomas Stokes,* for life-tenants, contra.

GEST, J., Feb. 2, 1923.—The auditing judge disposed of this case on the theory that the shares of stock in the three companies, which owned the coal mines and leased the same upon royalties, were wasting investments, to which the rule of Howe *v.* Earl of Dartmouth, 7 Ves. 137, would apply, except for the power given in the will to the trustee to retain investments existing at the date of the death of the testatrix. After attentive consideration, we are satisfied that the auditing judge was correct in awarding the dividends as income to the life-tenants.

Roberts's Estate.

We are, however, of the further ·opinion that the same result may be reached along another line of reasoning. The corporations, whose shares were owned by the testatrix and which she empowered her trustee to retain, were each the owner of a single mine already open in the lifetime of the testatrix. Her first stocks were acquired by her in 1858, and she increased her holdings at various times until 1898. She made her will in 1909 and died in 1916, so that for many years prior to the execution of her will and up to the date of her death she had received dividends upon these stocks precisely similar to those in question. In fact, as we are informed, these coal companies were close corporations, organized for the very purpose of leasing the coal properties belonging to the family of the testatrix.

Now, it is clear that if the testatrix had been herself the owner of these coal mines, and had devised them to certain persons for life, with remainder to others, the life-tenants would have been entitled to the entire income derived from royalties on the coal mined, even if the leases ran to the exhaustion of the coal. This is settled in Pennsylvania, and, as it has been frequently said, has become a rule of property established by a long series of decisions from Neel v. Neel, 19 Pa. 323, and Irwin v. Covode, 24 Pa. 162, to Blodgett's Estate, 254 Pa. 210. The same result should follow if the testator, instead of being the sole owner of the mines, was a tenant in common with others, and it is immaterial that the gift was made in the form of a trust, as in Eley's Appeal, 103 Pa. 300, and Shoemaker's Appeal, 106 Pa. 392. This being so, the fact that her interest was represented by shares of stock in the mine-owning companies is really immaterial, especially in view of the fact that she empowered her trustee to retain the investment. Equity regards the substance and not the form, or, to use a homely metaphor, will crack the shell to get at the kernel, and the fact that the owners of these coal properties put them in corporate form is merely a matter of administrative detail. Indeed, dividends of corporate stock belong, *prima facie*, to the life-tenant, but when any question arises as to the relative rights of the life-tenant and the remainderman, the court will always ascertain the derivation of the moneys from which the dividends were declared. This is done without question, both in England and in this country, in the frequent cases of extraordinary dividends, where the money has been earned partly before the death of the testator and partly afterwards, under the familiar doctrine of Earp's Appeal, 28 Pa. 368, and also with like frequency in cases of wasting assets, as indeed the auditing judge has done in this present instance. There is no reason apparent to us why we should not determine here that these dividends, being derived exclusively from royalties on coal taken from mines open at the death of the testatrix, belonged, as such, to the life-tenants, under the doctrine of Neel v. Neel.

We are of opinion, moreover, that this accords with the intention of the testatrix. For fifty years before she made her will, she had been receiving these royalty dividends, and when she directed her trustee to pay to her nephews and nieces "the interest, income and profits" of her residuary estate, to be retained in specie at the discretion of her trustee, of which these stocks constituted a considerable part, it seems to us that she intended the life-tenants to receive as income the dividends. which she herself had regularly received for so many years: Reed v. Head (Mass.), 6 Allen, 174. No reason is apparent to us why she should be presumed to favor the children (some of them, perhaps, not now *in esse)* of nephews and nieces, rather than the nephews and nieces themselves. Nor do we think that the provision in the will for the maintenance of minor remaindermen, during their minority, after the death of the life-tenants, is of any importance in determining the question at bar,

2 D. & C.

which relates to the *quantum* of their estate, not how it shall be used. They will have enough to maintain them.

We may add that the case was argued with signal ability by the guardian *ad litem,* who filed the exceptions, and also by the learned counsel for the life-tenants.

The exceptions are dismissed and the adjudication is confirmed absolutely.