On February 16th, 1918, the late United States Senator Clark, of Montana, divided two hundred and forty thousand shares of his United Verde Copper Company stock into eight equal parts, gave one of these parts to each of his six children, and retained the other two parts for himself. Three of his then adult children received their respective parts by outright gifts, while those of complainant (formerly Mary Clark Kling), and of his two other children, who were then infants, were trusteed to defendant Commercial Trust Company of New Jersey, under three separate deeds of trust then made by him for their respective benefits.
Under the provisions of the trust so created for complainant's benefit, the settlor transferred to the trustee:
"Thirty thousand shares of the capital stock of The United Verde Copper Company (a Delaware corporation) represented by certificate number thirty-six * * * to receive and hold the said securities * * * and to collect, recover and receive the rents, issues, interest, income and profits thereof, hereinafter called the "income" and to invest, reinvest, deal with and dispose of said income and in such manner as herein provided, to expend and pay both principal and income."
This trust deed further provided that:
"During the continuance of the trust payment of the income shall be made as follows: to the said Mary Clark Kling, during her lifetime."
The United Verde Copper Company owned and operated a copper mine, which constituted its only business. During the years 1930 and 1931 it paid to the Commercial Trust Company, as trustee, the sum of $818,899.20 as dividends on the stock thus trusteed to the latter for complainant's benefit. These dividends, however, are alleged to have been declared and paid out of what on the books of the company is designated as "reserve for depletion." Complainant, as the *Page 217 
first life tenant, contends that this money should be paid to her as "income" of the trust, while the subsequent life tenant and contingent remaindermen take the position that it should be allocated and retained by the trustee as corpus. This is the issue to be here determined.
The aim of a court of equity, in construing a trust deed, is, and should be, to ascertain and carry out the settlor's intent.McCracken v. Gulick, 92 N.J. Eq. 214; Woods v. Woods,102 N.J. Eq. 502, 506, reversed, but not on application of this principle, by the court of errors and appeals in 105 N.J. Eq. 205
(at p. 208). While it is true, as contended on behalf of the defendant infant remaindermen in being, that this intent must be gathered from the trust instrument itself, nevertheless it is equally true that extrinsic evidence with respect to the circumstances surrounding the creation of the trust and the settlor's conception of any ambiguous words employed by him in the trust instrument, may be received and considered for the purpose of enabling the court to deduce his intent from the trust instrument itself.
The reported cases with respect to what constitutes income and what corpus of a trust are numerous, diversified and predicated upon the peculiar facts presented by each of them. All of them, however, tend to demonstrate that the meaning of the word "income" is rather ambiguous, indefinite and, to say the least, dependent upon the peculiar facts existing in the particular case wherein its determination is called for. It is undoubtedly for this reason that all the present counsel have alluded to them.
Notwithstanding this, it is urged, on behalf of the defendant infant remaindermen in being that the settlor's declarations or conduct, whether prior or subsequent to the creation of the trust, and his interpretation thereof, are of no weight and entitled to no consideration in construing the instrument. But where, as here, words of ambiguity are used, I am satisfied that the true rule, as manifested by the great weight of authority, is that not only such but any other competent evidence tending to establish the settlor's understanding of the ambiguous word "income," is clearly admissible *Page 218 
for the purpose of showing what he understood and meant by that word as used by him in the trust instrument. 5 Wigm. Ev. (2ded.) §§ 2471, 2472; Suffern Galloway v. Butler, 21 N.J. Eq. 410; International Signal Co. v. Marconi Wireless Telegraph Co.of America, 89 N.J. Eq. 319; affirmed, 90 N.J. Eq. 271; Myers v.J. Wiss Sons Co., 94 N.J. Eq. 189; Kerney v. Johnson,104 N.J. Eq. 244; Ledell's Executor v. Starr, 20 N.J. Eq. 274;Camden and Atlantic Land Co. v. Lippincott, 45 N.J. Law 405.
It is also contended by counsel for the subsequent life tenant and contingent remaindermen, as a legal proposition, that inasmuch as the entire capital assets of the copper company consisted of ore, the subsequent extraction from the ground and transmutation of this ore into the form of a pure metal does not destroy its character of capital; and, consequently, the distribution of the proceeds realized from the sale thereof, less only the cost of its mining, milling, marketing and incidental overhead, must, of necessity, result, at least, in a part distribution of the capital, there being no charge off for the value of the ore so removed and converted into funds.
But, the legal reasoning and doctrines gleaned from the great weight of authority with respect to mining or so-called "wasting asset" corporations controverts, rather than supports, any such contention. That such corporations, as between their stockholders and themselves, may, in the absence of a contract to the contrary, legally pay dividends out of revenue without first creating or providing for a depletion reserve for recoupment for its wasting assets, was long ago decided in a number of cases, amongst which are Lee v. Neuchatel Asphalte Co., L.R., 41 Ch.Div. 1; 58 L.J. Ch. 408, and later by this court in Mellon v.Mississippi Wire Glass Co., 77 N.J. Eq. 498; 14 Corp. Jur. §1214 p. 802; People v. Roberts, 156 N.Y. 585;51 N.E. Rep. 293.
Both support and recognition for this rule may be found in a myriad of other reported cases holding that a life tenant, possessed of a life estate in property on which, at the *Page 219 
inception of the life estate, there are open mines, quarries, clay pits, sand pits, oil wells or which was then impressed with the character of mining property, has the right to work said mines, quarries, clay pits or oil wells even to the point of exhaustion and, to the exclusion of the remaindermen, appropriate all of the profits realized therefrom as the income and beneficial enjoyment of his life estate.
In Reed's Ex'rs v. Reed, 16 N.J. Eq. 248, a bill was filed by the remaindermen to enjoin the commission of waste by the life tenant, because of his digging up and removing from the land in question large quantities of sand for sale purposes. In dismissing the bill of complaint, the court there pointed out that "the tenant for life is entitled to work a mine, quarry, clay pit or sand pit, which has been opened and used by the former owner; the working of the mine or quarry is a mode of enjoyment of the land to which the tenant for life is entitled."
In holding that the proceeds realized from the sale of stone extracted from quarries upon the testator's land constituted income and not principal, this court, in Mulford v. Mulford,42 N.J. Eq. 68, said:
"The income given by the will to the widow and the son is the income of the residuary estate. The proceeds of the sale of building stone taken by the executor from quarries upon the testator's land, which were opened before his death and never abandoned, are part of such income."
Cases in foreign jurisdictions of similar import or holding include Robb v. New York, c., Gas Coal Co., 216 Pa. St. 418;In re McFadden's Estate, 224 Pa. St. 443; Cypress Creek Coal Co.
v. Boonville Mining Co., 194 Ind. 187 (at p. 197); Poole v.Union Trust Co., 191 Mich. 162; 157 N.W. Rep. 430.
The legal principles above referred to, even though they be not controlling nor dispositive of the issues here presented, are highly important and merit great consideration as manifesting or indicating what the settlor's conception of the word "income," as used by him in the trust instrument, was, where, as here, he was shown to be conversant and familiar *Page 220 
with the legal principles governing income of mining corporations.
From the uncontradicted evidence, it forcefully appears that the settlor, essentially and primarily, was a "mining man," possessed of a profound knowledge and thorough understanding of mines and mining operations; and especially of the legal rules, customs and usages applicable thereto. Under his personal guidance and supervision, the copper company, which was his pride, so flourished and prospered that it declared and actually paid on merely the stock trusteed for complainant the sizable sum of more than half a million dollars in dividends for the short space of time from February to May of 1918.
He could well lay claim to a vast familiarity with mining stocks and to a substantial understanding of the legal principles applicable to mining corporations. His certified accountant and personal counsel, who also acted as such for his copper company, at frequent conferences and discussions with him, expressed their views and opinions that the entire proceeds of mine operations, after deducting the costs of mining and depreciation of plant, constituted "income," without deduction for any depletion charge for the ore extracted from the mine. In these views, which were also his views, he always acquiesced and fully concurred.
And it was in accordance with these, their common views and conception of what constitutes income, that no reserve for depletion was ever taken into consideration or set up upon the books of the copper company until December 31st, 1913, and then only, as testified to by its certified accountant, for the purpose of complying with the provisions of the income tax law and the regulations and requirements of the department of internal revenue, and not for the purpose of actually creating such a fund. Up to then the senator and the copper company had taken, and thereafter maintained, the position, in their controversy with the United States treasury department, with respect to what constituted "income," that the entire proceeds yielded by its mine operations, less only the cost of mining and depreciation of plant, was its "income;" *Page 221 
without subjection to a depletion charge for the ore extracted from the mine. It was with this understanding and conception of the meaning of "income," as applicable to his copper company and in this sense, that the senator used the word "income" in the trust deed by which he created the trust for complainant.
The evidence also discloses that $4,000,000 out of the $5,500,000, which had been declared as dividends by the copper company for the year 1918, were paid out of its set-up or so-called "depletion reserve." Of this fact the senator was fully aware and approved. In addition to this the reports of the company, as prepared and submitted by it for the years 1919, 1920 and 1921 clearly revealed that all of the dividends declared by it during those years were paid out of its set-up or so-called "depletion reserve." Such was equally true with respect to the dividends paid out by it for the years 1922, 1923 and 1924. The evidence unquestionably demonstrates that the senator was thoroughly familiar with these reports, and consequently fully aware of the treatment by his copper company of its so-called "depletion reserve" as "income" and not as a fund for recoupment of the ores removed from its mine. That he was in full accord with and wholly approved of this policy and practice of his copper company, which was in complete harmony with his conception of the word "income," is not, and cannot be, here questioned.
It was not until 1923 that any question ever arose as to whether so-called depletion dividends constituted income or capital of the trust. In an opinion then rendered to the trustee, by whom this question had been raised, Mr. Blackman, who was counsel to the senator and the copper company, and who had drawn the trust deed, held and advised that such constituted "income" and not part of the trust capital. And it was shortly thereafter that the trustee, with the senator's approval, paid over to complainant the dividends which it had received from the copper company during the year 1922, all of which the copper company had declared and paid out of its so-called theoretical "depletion reserve." *Page 222 
Furthermore, the evidence clearly shows that from the very creation of the trust down to the time of his death on March 2d 1925, the senator received quarterly statements from the trustee, each of which clearly showed its allocation of all so-called "depletion dividends" to "income" and its disbursement to complainant as such. There is no evidence, nor is it here even contended, that the senator ever found fault with or disapproved of any of these reports or the items as therein set forth.
In the face of such convincing evidence as hereinbefore and hereinafter referred to, the natural conclusion is irresistible that the senator understood and conceived the word "income" to mean the proceeds yielded by the mine, less only the cost of operations and depreciation, without any abatement for so-called "depletion reserve." And in the absence of evidence to the contrary, as is the fact here, it must, of necessity, follow that, in trusteeing his mining stock, he must have used the word "income" in no sense other than that in which he himself understood it, viz., the total proceeds yielded by the mine less only the cost of operations and depreciation of plant.
Were further support for this view necessary, it could readily be found in the very purpose for which the settlor created and designed the trust. His then son-in-law, complainant's husband, never met with nor gained his liking or favor. To safeguard against his intervening in the affairs of the copper company was the problem which confronted and seriously concerned the senator in considering the mechanics of his contemplated gift to complainant. Out of his discussions and deliberations, there was finally conceived the plan, here adopted, to trustee her stock, so that her then husband would not be in a position, directly or indirectly through her, to vote the stock allotted to her, thereby affording him a voice in the affairs and policy of the copper company.
No evidence nor argument is here presented that the settlor intended to discriminate against any of his children in the distribution of his bounty. To each of them he allotted an *Page 223 
equal number of shares of stock. Upon the death of one of them, Louise, he divided her shares, which had reverted to him, in equal parts to his five surviving children. By virtue of the stock allotted to them, each of his other children received and enjoyed outright as "income" dividends declared and paid by the copper company out of the same source as were those now under consideration. That the senator intended the complainant to have the same enjoyment as his other children is convincingly demonstrated by his having made equal provision for her with them, without any restriction.
The evidence fails to disclose any reason, nor has any been suggested, why the senator, whose cardinal aim was to equally distribute a considerable portion of his estate amongst his children, should have intended that all of his adult children, excepting complainant, should receive all dividends on the stock allotted to them, irrespective of whether such be declared out of earnings or so-called "depletion reserve," while complainant, during her lifetime, should be limited merely to the income declared out of so-called "current earnings."
Counsel has been unable to discover, and I have been unable to find, any evidence even suggestive of any desire or intent on the part of the senator to discriminate amongst his children with regard to their enjoyment of the substance of his bounty towards them. Whatever discrimination, if such it may be called, that may possibly here appear to have been made, was as to mere matter of form, not of substance. These, as respects complainant, he undoubtedly considered necessary, because of her then husband, whom he didn't like and thereby sought to preclude from having any voice, directly or indirectly through his spouse, in the copper company's affairs. Thus, it is apparent that his sole purpose and objective in trusteeing complainant's stock, was to protect and preserve the stock itself, and, incidentally through it, the policies of his copper company, and not to subject the "income" therefrom to any subtle or theoretical trust fund principles or regulations.
Vigorous contention is made by counsel for complainant *Page 224 
and the trustee that the "in specie rule" as defined and applied in Carle v. Monkhouse, 47 N.J. Eq. 73; Helme v. Strater,52 N.J. Eq. 591; Ott v. Tewksbury, 75 N.J. Eq. 4, and UnionCounty Trust Co. v. Gray, 110 N.J. Eq. 270, is here applicable and, therefore, should be here invoked. But, in view of the conclusions which I have already reached, I do not find it necessary to pass upon the contentions so raised, although they bear great merit.
On the other hand, counsel for the subsequent life tenant and the contingent remaindermen vigorously stress the unreported case of Hewitt v. Hewitt (not yet reported), decided by Vice-Chancellor Bigelow in 1931, contending that such is controlling and dispositive of the issues here presented. A reading of that case, however, reveals that it is distinguishable from, as well as inapplicable to, the facts existing in the case at bar.
There the learned vice-chancellor found that "if the dividends on the thirty shares of stock since Mrs. Hewitt's death, $55,460.76 were made out of surplus accumulated in herlifetime," and that these "dividends have been paid in part out of surplus accumulated before the death of testatrix," and therefore "must be apportioned" as between corpus and income. Such, however, is not the fact with respect to the dividends here in controversy. Furthermore, there is here present, as was not in that case, convincing evidence with respect to the settlor's conception of the word "income" as used by him and as gathered from the trust instrument.
From the evidence adduced, I am fully satisfied, and so find, that the word "income," as understood and used by the settlor, represents or means the entire proceeds of the mine operations, less only the cost of mining and depreciation of plant, without subjection to a depletion charge for the ore extracted from the mine, and that it was in this sense that the word was used by him in the trust instrument under consideration.
A decree will therefore be advised directing the trustee to make payment of the accumulated dividends in question to complainant. *Page 225