Neafie's Estate.

562

Argued January 5, 1937. Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Theodore Voorhees,* with him *Barnes, Biddle & Myers,* for appellant (surviving life tenant).

*Martin V. Bergen,* ancillary executor, propria persona.

*G. Ruhland Rebmann, Jr.,* of *Edmonds, Obermayer & Rebmann,* with him *Robert H. Skilton* and *John F. E. Hippel,* for remaindermen and their representatives.

OPINION BY MR. CHIEF JUSTICE KEPHART, March 22, 1937:

The will of Jacob Neafie, who died January 16, 1898, created successive life estates in the income of a trust; first, to his daughter, Mary E. Whitaker, and on her death, to her two children, J. G. N. Whitaker and Anna Whitaker (now Jardine). Upon the death of J. G. N. Whitaker on January 21, 1928, Anna Jardine became and continues as the party solely entitled to the income.

Included in the trust were 107 shares of the Fidelity Trust Company which, at the testator's death, had an intact value of $244.41 per share. In 1912, through an increase in capitalization by the company, the trust estate received subscription rights equal in number to the shares held by it in the Fidelity Trust Company. These were sold at an average price of $515.87 a right. The book value of each share was $687.73. The difference between this book value and the intact value of each share of $443.32 represented earnings which had accumulated after the creation of the trust. The difference between the sale price of a right and accumulated earnings, or $72.55 per share, was capital gain.

Shortly after the sale of the rights the trustees filed an account in which the stock and the proceeds from the rights were awarded to principal, and the intact value of the stock was "reduced" by the trustees to $100 per

share. The life tenants made no claim for an apportionment of the proceeds of the rights and the adjudication awarding the proceeds to principal was confirmed absolutely. Following the death of the first life tenant, a second account was filed, stating: "This account is stated to show the amount of net income due the Estate of Mary E. Whitaker, Deceased, to the date of her death January 16, 1916." To the second account filed in 1924, again no exceptions were taken by the life tenants and it was confirmed.

In 1926 the Fidelity Trust Company merged with the Philadelphia Trust Company to form the Fidelity-Philadelphia Trust Company, and the estate received in exchange for the 107 shares held by it in the Fidelity Trust Company 107 shares of the new company. These were retained in the trust until 1934 when they were sold at an average price of $269.79 a share. The dispute between the remaindermen and life tenants in the court below and here centers about the proceeds of the stock rights retained by the trustees as principal or, conversely, the distribution and apportionment of the proceeds of the sale of the stock.

Had a claim for apportionment of the proceeds from the rights been made at the proper time, a division would have been necessary in accordance with our rules. Since, admittedly, $443.32 per share accrued through earnings accumulated after the inception of the trust, this sum would have gone to the life tenant: *Waterhouse's Estate*, 308 Pa. 422. As the rights sold for $72.55 more than the surplus shown to have accumulated, this excess would have been awarded to principal as a capital gain: *Nirdlinger's Estate*, 290 Pa. 457, 479; *Waterhouse's Estate*, supra, at p. 429.

The court below found that whatever rights the life tenants had in these proceeds were lost by their inaction following the confirmations of the adjudications of the accounts in which this sum was awarded to principal. Under Section 48 of the Fiduciaries Act of June 7, 1917,

P. L. 447, we have held that when an account has been audited, adjudicated and confirmed absolutely, a petition for review cannot be entertained more than five years thereafter. While this proceeding is not in form a petition for review, to now go beyond the prior adjudications after the elapse of five years, and correct an error to which the life tenants had full opportunity to object, would be an indirect method of disregarding the statutory limitation upon reviews of accounts. In *Stetson's Estate,* 305 Pa. 62, the trustee received and sold stock rights and allocated the proceeds to principal. Accounts showing such allocation were approved by the court and confirmed absolutely without exception by the life tenant. It was held that the claim of the life tenant to these proceeds was barred after five years following the confirmation of the account. This court stated: ". . . this section of the Act of 1917 (Section 48) must be construed to mean that the party 'alleging errors in such account, or in any adjudication of the orphans' court, or any report' . . . can only effectively do so 'within five years after the final decree confirming' the account." See also *Elkins's Estate,* 325 Pa. 373. The conclusion of the court below was correct.

It is now argued that the quality of the proceeds placed in principal or corpus from the sale of the rights was not changed—that they were still earnings and were not included definitely in the prior adjudications. It is difficult to understand this position when we consider the finality of the action of the court below. It is true that in *Bullitt's Estate,* 308 Pa. 413, we held that an adjudication was not res judicata of a sum fixed for intact value by the trustees, but none was there established by the court below, a fact clearly demonstrable from the records. Here, whatever may have been the purpose of placing the proceeds in principal, subsequent decrees have so sealed it there in its changed aspect, that to disturb it now would be to avoid the act of assembly providing for the repose of accounts.

Nor would the distinction offered, that *Bullitt's Estate* concerned retention of the stock dividend and this of cash subsequently invested in other securities, alter the correctness of the conclusion reached by the court below that the proceeds were principal. It is contended that life tenants do not here seek the proceeds of the sale of rights, but that when they were placed in principal the intact value of the 107 shares was reduced or eliminated. In other words, cash to the equivalent of intact value took the place of the stock as corpus, and the shares of stock held in trust were released from any further obligation to the remaindermen; that the stock should be treated as income and, when sold, distributed as such to the life tenants. If this plan were successful, by indirection that would be accomplished which the statute above referred to forbids doing directly.

The life tenants place reliance upon the fact that the trustees reduced the shares to their par value in their account when they received the proceeds from the rights. They lean on *Jones v. Integrity Trust Co.*, 292 Pa. 149, 153, where this court stated, in an opinion by Justice SIMPSON, that if the trust estate sells the rights to subscribe to additional shares and retains the proceeds in the corpus of the trust then the intact value of the original shares for the purpose of future distributions will be the original intact value less the amount thus received. Without attempting to discuss this rule the apparent reason why it cannot be of aid to the appellants is that in *Jones v. Integrity Trust Co.*, supra, no adjudication or lapse of time had intervened to bar the right of the life tenant.

Intact value to be preserved for the remaindermen cannot be altered by the trustees to the prejudice of life tenants or remaindermen. The trustees cannot voluntarily choose to write down or up the value of stock held in trust and thereby change intact value. In *Bullitt's Estate*, supra, a stock dividend was retained in principal and an adjudication showing such retention was

confirmed. In the apportionment of a second stock dividend the court held that the first stock dividend became a part of the principal at its then value. We held, however, that the intact value of the original shares was not to be increased because of this. The action of the trustees in this case in reducing the value of the Fidelity Trust Company shares to the par value was, therefore, properly rejected by the court below.

For the purpose of determining the apportionment and distribution of the proceeds of certain stocks, the life tenants claim that losses suffered by the corporation between 1931 and 1934 should be charged as capital losses. The shares of the Fidelity Trust Company are used to typify the problem presented.

A considerable surplus was accumulated after the testator's death, and as a result the stock had a book value over and above the intact value. It is admitted that this surplus value was due to earnings accumulated after the testator's death. From 1931 to 1934, as a result of the depression, a write-down in the value of the bank's assets was made and the depreciation charged against surplus or what might be termed the undivided profits account. It affirmatively appears in the record that this was the method used by the bank in charging the loss.

*Dickinson's Estate,* 285 Pa. 449, relied on by appellant to establish that the write-down was a capital loss is clearly distinguishable. There the loss not only wiped out the entire surplus earned after the death of the testator, but encroached into the surplus accumulated prior to his death and which, therefore, made up part of the intact value. Accordingly it was held that both life tenant and remaindermen must share the loss. Here the loss affected only the surplus accumulated after testator's death; it did not touch upon the surplus accumulated prior thereto.

In *Graham's Estate,* 296 Pa. 436, 440, in discussing the surplus of a corporation, this court stated: "From this same surplus are properly deductible losses on ac-

count of bad loans or other investments accruing during the period of the . . . life tenancy." Again in *Baird's Estate*, 299 Pa. 39, 42, this court said: "Ordinarily the courts will accept the company's manner and method of charging various items as correct when it is done in good faith, and the presumption would be that it is so done; the burden of showing the contrary is on the party asserting it." The company employees testified that while the losses were not charged against current earnings, they were deducted from undivided profits or surplus. The good faith of the corporation in this action not being impugned, under the facts what occurred was plainly a business loss. It is proper that the loss be borne by undivided profits or the surplus account. The losses occurred during the period of the last life tenancy and were charged against the most recently accumulated surplus. This succeeded in wiping out any share of the surplus to which the present life tenant, Mrs. Jardine, might have been entitled after the death of J. G. N. Whitaker. The surplus remaining was then "equitably" divided between the estates of the two deceased life tenants and Mrs. Jardine.

It is claimed the court below erred in its manner of apportioning the surplus between the successive life tenants, the contention being that the apportionment should be calculated as of the death of each life tenant. On this basis no part of the loss which occurred subsequent to the death of the first life tenant would be borne by her estate.

The rules for apportionment in this jurisdiction are designed to give to life tenants earnings accumulated during that life tenancy, but for a distribution of such earnings it has always been necessary that the corporation declare a dividend whether of cash or stock, that the trust estate receive rights to subscribe or that there be a liquidation of the corporate assets or of the trust holdings: *Buist's Estate*, 297 Pa. 537. Where the stock remains in trust unsold, the fact that the corporation

has accumulated a surplus from earnings does not entitle the life tenant to a division of the assets of the trust estate, so as to furnish him with these withheld earnings. In *Opperman's Estate*, 319 Pa. 455, 461, it is stated: "Corporations do not make a practice of distributing all current earnings as dividends; surpluses are built therefrom to be drawn on in years of corporate famine when current earnings are not sufficient to meet dividend requirements." In *Nirdlinger's Estate*, 290 Pa. 457, 477, the court said: "The stock, with its accumulated earnings and intact value and whatever other elements of value which may attach to it, is subject to the vicissitudes of corporate life and as such it must bear its share of whatever comes and goes. . . . The surplus and other items of value remain, subject to debts, reverses, losses and declines in value because of business conditions. As long as the stock remains in the hands of the trustee, he is not required to account to life tenants for anything except the dividend received."

These purposes for which the surplus is held and which forbid its distribution to the life tenant while the stock remains in the possession of the trustees also forbid the right to surplus to become fixed in the life tenant's estate as of the date of his death, awaiting only its realization by sale of the stock or otherwise, so as to award to the surplus accumulated to the date of death of the first life tenant an immunity from losses occurring thereafter. But the surplus has no such immunity and, but recently, this court rejected a claim that apportionment should be made when the life tenant dies so as to leave only the intact value of the stock for the remaindermen, and give undistributed surplus to the estate of the life tenant: *Daily's Estate*, 323 Pa. 42. To hold as is here contended would strip the succeeding life tenants for the benefit of the first. While our rules provide for an apportionment where the stock is sold, the price obtained by the sale is not always representative of the entire accumulated surplus. To award the

estate of the first life tenant a share in the same based on the calculations as of her death might very well deprive the succeeding life tenants of any share in this surplus notwithstanding that it may have been earned in part, at least, during the period of their estates. In distributing the surplus on a proportionate basis as the court below did, each succeeding life tenant bore his share of the burden of the loss attributable to his undistributed surplus. The award was a most equitable determination of a difficult question and one that does substantial justice to all parties.

Successive life estates in income undoubtedly were considered by this court in *Graham's Estate,* supra, and cases there cited; and in *McKeown's Estate,* 263 Pa. 78, an opinion by Justice SIMPSON. We cannot conceive of any sound reason to deny the life tenant his share in realized surplus when we consider that this court has held over and over again that our concern is always for the life tenant. To see earnings pyramided for years in surplus and the stock market value increase until the last living or a favored life tenant appears, then to liquidate the stock and give to that life tenant the earnings for these years reflected in sale price and deny them to the estates of the intermediate life tenant during which the earnings accrued, can scarcely be regarded as fair. Indeed the reason underlying the Pennsylvania rule is applicable to this very situation. The extent to which an apportionment may take place between successive life tenants must be governed by the facts in each case, and the conclusion of the court below on such facts will be adopted in this court unless there is an abuse of power.

It is urged, however, that trustees could abuse their power by holding the stock with its increased value for the benefit of remaindermen; if such situations arise the courts may be appealed to, and if a real injustice is being done, relief may be granted.

Successive life tenants can only participate when there is a sale or liquidation of the stock during the life

of the trust. When the shares released of the trust pass to the remaindermen the trust estate is ended, and the stock is freed from any claim by the life tenants. The remaindermen are entitled to all the value inherent in the stock immediately on the dissolution of the life tenancy except as to ordinary dividends specifically provided for by Section 22 of the Act of June 7, 1917, P. L. 447; cf. *Given's Estate*, 323 Pa. 456; see *Daily's Estate*, supra.

Decree affirmed at appellants' cost.