Knox's Estate (No. 1).

178

[redacted]

Argued October 6, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Lee C. Beatty,* with him *Richard W. Ahlers,* for trustee, appellant.

*George B. Berger,* with him *William A. Wilson, James M. Houston* and *Wm. F. Knox,* for appellees.

Opinion by Mr. Chief Justice Kephart, November 12, 1937:

Senator Philander C. Knox died on October 12, 1921, and by his will set up a trust in his residuary estate. The trustees were directed to divide "any and all remainder of the net income arising from such trust fund" in equal shares among his widow and four children for life, with gifts over of each share except that of his son Hugh. Upon the termination of the trust the corpus is to be distributed per stirpes among the living issue of testator's daughter and two of his sons, and, there being no issue, to his heirs at law.

Testator acquired 1,600 shares of common stock of the Cerro de Pasco Copper Corporation, which were among the assets of his estate at the time of his death and were retained by the trustees in the corpus of the trust. The corporation, organized in 1915, owns and operates mining properties in Peru, South America. It acquired its mining assets through funds obtained by the issuance of "no par value shares"; the value in excess of the price at which the shares sold was allocated to "capital surplus." Its principal business is the production and marketing of copper and other metals; the operation has caused a gradual depletion of its original assets through the extraction and sale of its products. To make up for this consumption of ore the corporation set up an item designated "depletion," which is supposed to represent the value of the ore extracted. As each unit is mined, its valuation fixed at a given sum is credited to the depletion reserve account, and this naturally increases as mining operations continue. The mining properties of the corporation through purchase increase are at the present time substantially the same as they were prior to 1920, with exceptions of minor importance, and throughout that entire period they have been in continuous operation.

The corporation throughout its history has pursued a regular dividend basis, with normal variations depend-

180

ing on business conditions. The dividends have averaged about one dollar per share, sometimes more, and at other times less or omitted entirely. From the inception of the trust through 1927, the trustees distributed all the dividends from this stock to the life tenants as income, but since then have retained as corpus the portion of the dividends reported by the corporation to have been paid from the depletion reserve account, and which are charged on its books to "capital distributions," in turn offset against "capital surplus." In some instances the trustees have allotted the entire dividend to principal, and in others they have held it pending a determination of its source.

On July 30, 1935, the trustees sold 500 shares of the 1,318 shares remaining in the trust for $29,616.65, and accounted for the entire proceeds of the sale as principal.

The life beneficiaries filed exceptions to the decree nisi confirming the third triennial account, claiming all the dividends received by the trustees on the stock, and the portion of the proceeds of the sale of stock which represented undistributed earnings. The court en banc, in an able and learned opinion by Judge CHALFANT, sustained the exceptions and entered a decree awarding to the life tenants all the dividends paid on the copper stock not previously accounted for, and the proceeds of the sale representing undistributed earnings, on the theory that reserves for depletion withheld by the corporation from surplus earnings are to be treated as income upon distribution.

The question for us to pass on is whether the dividends paid by the Cerro de Pasco Copper Corporation out of reserves for depletion, set up from surplus earnings, are "income" payable to the life beneficiaries of the testamentary trust.

Appellant recognizes the firmly established principle that ordinary dividends, in the absence of unusual circumstances, are to be regarded as income payable to the

party entitled to receive them at the date of their declaration.[1] Under this rule the life beneficiaries would be entitled to the entire proceeds of the dividends paid by this corporation, unless the remaindermen are able to prove the existence of an unusual circumstance giving rise to an apportionment. Appellant contends this burden has been carried, and the remaindermen have brought themselves within our rule in *Opperman's Estate (No. 1)*, 319 Pa. 455, where we stated at p. 460: "An unusual circumstance is not one set up by the fiduciary or the court, but comes from some administrative or corporate act within the corporation or some breakdown within the corporate structure, . . ." It was there held that the act of the corporate directors in reducing the number of shares of stock so as to create the surplus distributed in the form of a dividend, was an unusual circumstance, requiring the application of the rule of apportionment in *Earp's Appeal*, 28 Pa. 368. It was pointed out at p. 462 that there is a "distinction between earned surplus and contributed capital. Contributed capital is neither earnings nor increment, nor may it be included in 'income' when that term is used in a will and, if paid by way of dividends, current or otherwise, it belongs to corpus; . . ." We were there dealing with actual cash created by a reduction in capital stock, not with profits earned by the corporation through normal business operation placed in a reserve account. Appellant's contention is that the depletion reserve is to all intents and purposes on the same basis as contributed capital; if this is not so, the ultimate result may

---

[1] "This court has repeatedly stated that ordinary dividends are not subject to apportionment in the absence of unusual circumstances, and must go in their entirety to the person entitled to them at the date of their declaration, which, under our decisions, is determinative of the rights of the parties, for the reason that the declaration brings into existence both the dividend and the shareholder's right to receive it": In re *Nirdlinger's Estate (No. 1)*, 327 Pa. 160, 165.

be the shares of stock would become valueless upon total depletion.

Appellant does not consider all the circumstances surrounding the investment in a "wasting asset" corporation, nor all the facts surrounding its life. Nor does appellant consider their bearing on the intent of the testator as manifested by his will as to how such dividends are to be treated. Appellees argue that the facts controvert the existence of any intention on the part of the testator to withhold from the life beneficiaries, who are his widow, children and grandchildren, the dividends paid by the corporation even though they may include, in whole or in part, funds set aside to take the place of the ore or metals extracted at a fixed value per unit.

In apportionment cases, under our settled rules, the rights of the parties must first be determined in the light of the intent of the creator of the trust, whenever it is at all possible to ascertain his purpose from the instrument creating the trust and the surrounding circumstances. See *Robinson's Trust,* 218 Pa. 481, 486; *Boyer's Appeal,* 224 Pa. 144, 153. In considering these cases this basic rule must guide and control, and it is then that many cases, which on their surface appear difficult of solution, become easy to solve. Apply it to the instant case. The testator owned the stock during his lifetime and received dividends regularly over a period of approximately four years. He was a lawyer of eminent standing and was fully conversant with rules of property in force in this state, and with the practices and power of corporations engaged in the exploitation of mines or other wasting assets to declare dividends from net profits without making any deduction for depletion of assets by lapse of time, exploitation or otherwise: Act of May 5, 1933, P. L. 364, Art. VII, Sec. 701, Subd. C, as amended by Act of July 17, 1935, P. L. 1123, Sec. 1. In Fletcher on Corporations, Volume II, Section 5347, p. 868, it is stated: "The justification usually ad-

vanced for the rule is that as the business of a wasting asset corporation is to exploit and exhaust its assets, no one expects that its capital will be kept intact; and that to require a sum to be set aside for depletion would eventually turn a mining company, for example, into an investment trust." One who invests money in a corporation, which must necessarily exploit and consume its assets to operate, should anticipate that eventually his investment may become worthless upon exhaustion of the assets of the company, if the company chooses to avail itself of its right to pay out as dividends all net receipts above the ordinary charges, without setting aside a fund to take care of assets extracted and consumed. The owner of the stock cannot complain, as he is being paid pro tanto for his capital investment with its natural earnings, if any. It is reasonable to suppose that where one invests in such a stock, and later it becomes part of the res of a trust, as here, he intends those who are to receive the "income" of the trust to have the benefit of all dividends paid out of profits from mines opened during his lifetime, whether from depletion reserves set up out of earnings or ordinary earnings above such reserves. These corporations may distribute these earnings without deduction for a reserve for depletion, and the withholding of reserve funds does not alter the rights of the life tenant to them. It is difficult to conceive how in the measurement of value of these stocks there could be any accurate accounting for tax purposes when they are sold.

We need not depend on this analysis to sustain the conclusion of the court below that gave the life tenants all the dividends. It has long been an established principle in this state, so rigidly enforced it is now a rule of property *(McFadden's Estate,* 224 Pa. 443, 447), that where the owner of land, containing minerals, creates a legal life estate with the remainder over, the life beneficiary is entitled to retain for himself all proceeds derived from the operation of the mines, without making

184

provision for a fund to offset depletion. This rule had its origin in *Neel v. Neel*, 19 Pa. 323, where this court held that a tenant for life of land containing open coal mines may operate them for sale, stating at p. 328: "The fact of his [testator's] opening the pits made the coal a part of the profits of the land, and the right to them will pass as such by devise of a life estate. If he meant otherwise, he should have said so; not having said so, this is the legal influence of his intention. . . . The most obvious inference would seem to be that, when a man devises land with an open mine upon it, to a person for life, he intended the devisee to derive profit from the mine, as well as from the surface of the land." This rule has been affirmed in many subsequent cases: *Irwin v. Covode*, 24 Pa. 162; *Lynn's Appeal*, 31 Pa. 44; *Westmoreland Coal Co.'s Appeal*, 85 Pa. 344; *Sayers v. Hoskinson*, 110 Pa. 473.

This rule has been applied to equitable life estates. It is now settled that the imposition of a trust does not alter the intention of a testator to have treated as income all the profits derived from the operation of open mines, and this is true as to unopened mines where the trustees are vested with the power to sell or lease: *Eley's Appeal*, 103 Pa. 300; *Wentz's Appeal*, 106 Pa. 301; *Shoemaker's Appeal*, 106 Pa. 392. See also *Woodburn's Estate*, 138 Pa. 606; *Blodgett's Estate*, 254 Pa. 210. There is in this respect as to coal lands no substantial difference between opened and unopened mines where the representatives of the estate have the power to operate. All coal lands come under the rule that the life tenant is entitled to all net proceeds above the cost of operation and fixed charges such as interest, taxes, etc.

If Senator Knox had died possessed of an undivided interest in the mining lands owned by the corporation, the life beneficiaries of the trust would have been entitled to receive as income his share of the royalties accruing to the trust estate, since the evidence shows that the same mines have been in continuous operation both

before and after testator's death. Does the fact that testator's interest is represented by shares of stock operate to deprive the life beneficiaries of the profits derived from the mines, to which they would be entitled in the absence of the intervention of the corporate entity? The existence of a trust, without more, does not destroy the right to all the proceeds derived from the operation of the mines, even though worked to the point of exhaustion. The fact that the ownership is represented by shares of stock does not alter the rule. There is no sound reason for a distinction between the former ownership in personam and that represented by shares of stock.

Our rules of apportionment look to the substance and not to the form. In determining the rights of life tenants and remaindermen to the multifarious types of dividends paid by corporations, it has been the settled practice of this court to ascertain the sources from which they are paid, in adjusting their respective rights equitably. The origin of the dividends in the instant case is not disputed. They came from profits made by the corporation in carrying out the purpose for which it was formed. The execution of that purpose necessitates consumption of capital assets, and the corporation has full freedom to distribute such earnings without deduction for depletion. The corporate mask cannot deprive the life beneficiaries of the right to all the profits distributed by the mining corporation in the form of dividends, to which, admittedly, they would have had a right had the testator had a direct interest in the mining properties of the corporation which were opened and operated during his lifetime. To hold otherwise would be to completely ignore the source of these moneys and to bring about a harsh and inequitable result, which could not have been within the contemplation of the testator.

The late Judge GEST, in *Roberts's Estate*, 2 D. & C. 667, was confronted with this question, and in a carefully considered opinion arrived at the conclusion that

the corporate entity could not affect the rights of the life beneficiary.[2] See also *De Brabant v. Commercial Trust Co.,* 113 N. J. Eq. 215, 166 A. 533.

Appellant places great emphasis on the fact that Section 239 of the Restatement of Trusts provides that where wasting property is held in trust, the trustee must make provision for amortization or sell such property, unless it is otherwise provided by the terms of the trust. But, it should be noted that Comment (g) under this section provides in part: "The mere fact that the mines or wells or quarries were opened by the settlor prior to the creation of the trust does not necessarily indicate an intention that the receipts therefrom should be treated wholly as income; . . ." While the Pennsylvania rule of property, above mentioned, has not been adhered to in the Restatement, under the firmly established principle of stare decisis we are not now in a position to depart from this rule in a matter of such great importance on the faith of which large property rights have been predicated. For this reason it would be unavailing to embark upon a discussion of the merits or demerits of the principle enunciated by the Restatement.

---

[2] Judge GEST stated at p. 672, after pointing out that if the deceased had owned the mines himself, or an undivided interest in them, whether the gift was in trust or otherwise, the life tenant would have received the entire income derived from the coal royalties: "This being so, the fact that her interest was represented by shares of stock in the mine-owning companies is really immaterial, especially in view of the fact that she empowered her trustee to retain the investment. Equity regards the substance and not the form, or, to use a homely metaphor, will crack the shell to get at the kernel, and the fact that the owners of these coal properties put them in corporate form is merely a matter of administrative detail. . . . There is no reason apparent to us why we should not determine here that these dividends, being derived exclusively from royalties on coal taken from mines open at the death of the testatrix, belonged, as such, to the life tenants, under the doctrine of *Neel v. Neel.*"

Appellant stresses the fact that the corporation deducted the dividends, here retained by the trustee, from capital surplus, and notified the stockholders that to that extent they represented disbursements of depletion reserves. For income-tax purposes the corporation offset such distributions against capital surplus because it constituted a return to the stockholder in the form of cash of a part of his original investment represented by the ore and metals extracted. While ordinarily the courts will accept the corporation's method of charging items as correct in the absence of bad faith *(Neafie's Estate,* 325 Pa. 561, 568), and the trustee must exercise great care in allocating between income and principal, taking notice of corporate reports informing him of the source of dividend distributions *(Opperman's Estate (No. 1),* supra, at p. 463), nevertheless accounting practices must give way to the actual substance, and the rights of the parties governed thereby. The capital accounts showing acquisitions, increases in holdings and betterments with their manifold intricacies are too illusory or too difficult for any one but a most expert accountant to ascertain whether the surplus reserve from earnings at the end of a given time would not exceed any possible capital expenditure with the bulk of the property remaining unused. Here the property is substantially the same today as it was in 1920. It is undisputed that the amount charged to capital surplus in fact represented a distribution of surplus earnings allocated to depletion reserve. The case must be viewed in this light, and the corporate act in charging the dividends to capital surplus is not conclusive of the allocation to be made between life tenant and remainderman of the dividends of the "wasting asset" corporation.

The court below properly awarded to the life beneficiaries the proceeds of the sale of the 500 shares which represented undistributed surplus earnings. Furthermore, the life tenants are barred after the lapse of five years from asserting any claim to dividends which were

awarded to corpus by the final decree entered on October 10, 1929: *Elkins's Estate,* 325 Pa. 373; *Neafie's Estate,* 325 Pa. 561, 564.

Decree affirmed; costs to be paid by the estate.