**BAZE v. SCOTT et al.**
No. 1850.

Circuit Court of Appeals, Tenth Circuit.
Aug. 22, 1939.

R. M. Mountcastle and Forrester Brewster, both of Muskogee, Okl. (Earl G. Anthis, of Muskogee, Okl., on the brief), for appellant.

W. F. Semple, of Tulsa, Okl. (A. H. Ferguson, of Durant, Okl., on the brief), for Lonie Scott.

William R. Sherwood, Atty., Dept. of Justice, of Washington, D. C. (Charles E. Collett, Acting Asst. Atty. Gen., Cleon A. Summers, U. S. Atty., and Charles N. Champion, Asst. U. S. Atty., both of Muskogee, Okl., C. W. Leaphart, Sp. Asst. to Atty. Gen., and Norman MacDonald, Atty., Dept. of Justice, of Washington, D. C., on the brief), for the United States.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

Hickman Willis was a full-blood Mississippi Choctaw enrolled opposite Roll No. 165. A tract of land was allotted to him as his homestead and patent duly issued to him therefor. With the approval of the Secretary of the Interior he executed an oil and gas lease of the homestead. The lease was developed and oil and gas were produced therefrom in paying quantities during Hickman's lifetime. He died July 17, 1925, leaving surviving him as his sole heirs Lodie Baze, nee Willis, a child born after March 4, 1906, and Lonie Scott, a child born prior to that date.

Between Hickman's death and April 26, 1931, there accrued in the hands of the Secretary of the Interior from oil and gas royalties under the lease $73,869.31, and from interest realized on such moneys $9,277.24. On June 20, 1932, the accrued interest and one-half of the royalties were set apart for Lodie Baze under the supervision of the Secretary of the Interior, and the other one-half of the royalties was paid to W. W. Pierce, as the guardian of Lonie Scott. Of the funds distributed to Pierce, $26,203.08 is now on deposit in the Durant National Bank, Durant, Oklahoma.

On September 11, 1937, Lodie Baze commenced a suit in the district court of Bryan County, Oklahoma, against Lonie Scott, Pierce, as her guardian, and the

bank to recover the royalties paid to Pierce as guardian. Pursuant to Section 3 of the Act of April 12, 1926, 44. Stat. 239, 240, Lodie Baze caused notice of the pendency of the suit to be served on the Superintendent of the Five Civilized Tribes. Thereafter, at the instance of the United States, the suit was removed to the United States District Court for the Eastern District of Oklahoma and the United States filed an intervening petition in its own behalf and in behalf of both of the heirs.

From an adverse judgment Lodie Baze has appealed.

Section 9 of the Act of May 27, 1908, 35 Stat. 312, 315, in part provides:

"Provided further, That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March fourth, nineteen hundred and six, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof, for the use and support of such issue, during their life or lives, until April twenty-sixth, nineteen hundred and thirty-one; * * * in the event the issue hereinbefore provided for die before April twenty-sixth, nineteen hundred and thirty-one, the land shall then descend to the heirs, according to the laws of descent and distribution of the State of Oklahoma, free from all restrictions * *."

Lodie Baze contends that the special estate created by the statute gave her an estate equal to or analogous to a life estate; that a life tenant may work a mine, quarry, or well opened before the creation of his estate under what is commonly known as the open mine doctrine and that hence she was entitled to all the royalties and the earnings therefrom which accrued between the death of Hickman and April 26, 1931.

In Parker v. Riley, 250 U.S. 66, 70, 39 S.Ct. 405, 406, 63 L.Ed. 847, the allottee died intestate in November, 1908, leaving surviving a husband, Doc Willingham, and two children, Tootie Riley, born before March 4, 1906, and Julia Willingham, born after March 4, 1906. In 1912, Doc Willingham and the two children, acting through their respective guardians, with the approval of the Secretary of the Interior, gave an oil and gas lease on the homestead. The question presented was, who was entitled to the royalties during the existence of the special estate. The court said:

"We need not stop to consider whether, strictly speaking, the right thus specially given to Julia was an estate for life or for years; for it evidently was not the purpose to make any nice distinctions along that line. * * * The oil and gas lease was to run for 10 years and as much longer as oil or gas was found in paying quantity. It was given and approved under the provision in section 2 dealing specially with the leasing of restricted lands and homesteads. * * * The oil and gas were to be extracted and taken by the lessee, and for this royalties in money were to be paid. These minerals were part of the homestead, and the lease was to operate as a sale of them as and when they were extracted. In that sense the heirs were exchanging a part of the homestead for the money paid as royalties, but no heir was surrendering any right to the others. Thus the rights of all in the royalties were the same as in the homestead. Nothing in the Act of May 27, 1908, makes to the contrary. Under the provision in section nine specially providing for issue born after March 4, 1906, Julia was entitled for her support to the exclusive use of the entire homestead while she lived, but not beyond April 26, 1931, and those who took the fee took it subject to that right. The rights of all in the royalties must, as we think, be measured by that standard. In this view Julia is entitled to the use of the royalties, that is to say, the interest or income which may be obtained by properly investing them, during the same period, leaving the principal, like the homestead, to go to the heirs in general on the termination of her special right."

Since that decision the Department has uniformly applied the rule there announced, irrespective of whether the oil and gas lease was made before or after the death of the allottee.

In Rogers v. Rogers, D.C.Okl., 263 F. 160, decided October 15, 1919, Judge Williams applied the rule announced in Parker v. Riley, supra, to a lease made during the lifetime of the allottee. Congress by the Act of April 12, 1926, 44 Stat. 239, amended Section 9 of the Act of May 27, 1908, but notwithstanding the long-settled practice of the Department and the judicial pronouncement last adverted to above, it left the proviso here involved undisturbed.

The construction of a statute by a department of the government charged with its execution is entitled to respectful consideration and ought not to be overruled without cogent reasons.[1]

Moreover, we think the administrative construction is right. The rationale of the open mine doctrine is that the owner of the previous estate by opening mines on the land impresses it with that character of use and enjoyment, and absent provision to the contrary in the instrument creating the life estate,[2] manifests an intention that the life tenant may likewise use and enjoy the land.[3] Here the inquiry is not what use the allottee intended the after-born heir should enjoy; rather it is what use Congress intended such heir should enjoy.

The primary purpose of the Act of May 27, 1908, was not to create estates but to prescribe restrictions against alienation of lands by members of the Five Civilized Tribes and to provide for the removal of such restrictions. Members of the Five Civilized Tribes born after March 4, 1906, did not participate in the allotment of tribal lands. No doubt, that fact induced Congress to make special provision for heirs born after March 4, 1906. However, it accomplished this purpose not by creating a technical estate, but by continuing the restrictions as to certain lands. Congress by general language in Section 9 first provided that the death of an allottee of the Five Civilized Tribes should operate to remove all restrictions upon the alienation of such allottee's land. It then qualified this general language by providing that if any member of the Five Civilized Tribes of one-half or more Indian blood should die leaving issue surviving, born after March 4, 1906, the homestead of such deceased allottee should "remain inalienable," unless restrictions against alienation should be removed therefrom by the Secretary of the Interior in accordance with Section 1 of the act, "for the use and support of such issue, during their life or lives," until April 26, 1931. The effect of the qualifying language is that where an allottee dies leaving an after-born heir, the restrictions against alienation imposed by Section 1 of the act are not terminated but are continued until April 26, 1931, or until the intermediate death of such heir, or the removal thereof by the Secretary of the Interior. Holmes v. United States, 10 Cir., 53 F.2d 960; Parker v. Riley, supra, p. 69. What the statute created then was not an estate for life, but an estate for years, that is, until April 26, 1931, defeasible during its term by the death of such issue or the removal of restrictions by the Secretary of the Interior. Parker v. Riley, 8 Cir., 243 F. 42, 49. The oil and gas lease operated as a sale of the minerals to the lessee as and when they were extracted in consideration of the royalties reserved under the lease. In effect a part of the homestead was exchanged for royalties. The Secretary of the Interior having authorized the making of the lease and to that extent having removed restrictions against alienation, what remained restricted against alienation for the use and support of Lodie Baze was the surface

---

[1] City of Tulsa v. Southwestern Bell Tel. Co., 10 Cir., 75 F.2d 343, 349, and cases there cited;

Smiley v. Holm, 285 U.S. 355, 369, 52 S.Ct. 397, 76 L.Ed. 795.

[2] Tomlinson v. Humpich, 198 Ky. 474, 248 S.W. 1016, 1017;

Daniels v. Charles, 172 Ky. 238, 189 S.W. 192, 194;

Poole v. Union Trust Co., 191 Mich. 162, 157 N.W. 430, 432, Ann.Cas.1918E, 622.

[3] Gaines v. Green Pond Iron Mining Co., 33 N.J.Eq. 603, 609;

Neel v. Neel, 19 Pa. 323, 328;

Raynolds v. Hanna, C.C.Ohio, 55 F. 783, 802;

Higgins Oil & Fuel Co. v. Snow, 5 Cir., 113 F. 433, 439;

In re Knox's Estate, 328 Pa. 177, 195 A. 28, 31, 32, 113 A.L.R. 1185.

Tiffany on Real Property, § 248.

In Neel v. Neel, supra, the court said:

"It seems in this case that the author of the gift had sometimes sold coal out of these pits, but I do not conceive this to be material. It is sufficient that he opened them and derived any profit from them, even if it were only fire bote. The fact of his opening the pits made the coal a part of the profits of the land, and the right to them will pass as such by a devise of a life estate. If he meant otherwise, he should have said so; not having said so, this is the legal influence of his intention. And on this subject there is no conflict in the decisions * * * The most obvious inference would seem to be, that when a man devises land with an open mine upon it, to a person for life, he intended the devisee to derive profit from the mine, as well as from the surface of the land."

rights in the homestead and the royalties reserved under the lease. We find no indication in the Act of May 27, 1908, of an intention on the part of Congress to give to the after-born heir the right to consume the corpus of the homestead. The right given is to use, not to consume or exhaust,·the corpus. Hence, the statute gave to Lodie Baze the right to the use of the surface rights and the royalties—to take the earnings and profits thereof, not to take the corpus. She was entitled to the earnings and income from the royalties during her lifetime or until April 26, 1931, but she was not entitled to the corpus of the royalties.

It follows that the distribution made by the Secretary of the Interior was in accordance ·with the statute and the judgment is accordingly affirmed.