## Catherwood Estate

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

704

710

712

714

716

717

718

*Clarence E. Hall* and *Donald S. Cohan,* for life tenants.

*Thomas S. Weary,* guardian and trustee ad litem.

### Opinion sur Exceptions

LEFEVER, J., December 19, 1960.—We unanimously agree with the learned President Judge in his adjudication filed June 3, 1960, in holding that (a) the proceeds of the disputed sale of stock, being less than the trustee's carrying or account value, there was no apportionable event and, accordingly, the entire proceeds must remain in principal; (b) that under the Pennsylvania cases, the declaration by a corporation of *any* stock dividend, large or small, regular or irregular, at stated times or intermittent periods, is an apportionable event within the Pennsylvania Rule of Apportion-

ment; and (c) that under the rule laid down in Cunningham Estate, 395 Pa. 1, where any part of the stock dividend comes from "capital surplus" the dividend does not constitute an apportionable event.

A majority of the court agree with the learned president judge's adjudication in entirety. Accordingly, his adjudication is adopted verbatim as the opinion of the court.

All of the exceptions of the life tenants and the guardian and trustee ad litem are dismissed and the adjudication is confirmed absolutely.

### Concurring Opinion
### Sur Exceptions to Adjudication

BOLGER, J., December 19, 1960.—I concur in the distributions awarded in the adjudication and as affirmed in the majority opinion, principally upon the ground that the learned auditing judge did not palpably abuse his discretion. There can be little doubt that the directed apportionment of the small semiregular dividends will result in their being awarded eventually in the schedule of distribution, in full to the life tenants.

The suggestion of President Judge Klein that, because of the unworkability of the application of the rule of equitable apportionment, the Pennsylvania Supreme Court reverse several of its decisions,* which refused to give retroactive effect to the Principal and Income Act of 1945 as amended, is not based upon any citation of principle of Pennsylvania law or equity and lacks validity. In fine, the sole reason is expediency, an attribute of absolute power and the antithesis of legal and equitable principles of stare decisis, and of "the rule of law." It is my understanding that substantial pressures exist for amending the

---

* Crawford Estate, 362 Pa. 458; Pew Trust, 362 Pa. 468; Warden Trust, 382 Pa. 311.

act so that as now written it is by no means the last word.

While the effect of the present application of the rule of apportionment is said in some quarters to result in "chaos," nevertheless a danger signal should be raised as to the impact the suggested reversals would have upon existing trusts, especially those wherein no account has been filed for many years although stock dividends, rights and the proceeds of sales have been apportioned among the beneficiaries and in those trusts where such distributions have been made and accounts have been adjudicated "without prejudice" within five years. Possible surcharges and recoupment actions may result. The key question would be: As of what date would such reversal decree be effective, the effective date of the first Principal and Income Act of 1945 or otherwise?

It should also be stated that the area of the application of the apportionment doctrine is becoming narrower. The vast majority of existing problems are being resolved by court-approved settlement. Attrition will operate to reduce them still more and future compromise settlements will be facilitated as children who are now minors become of age and unascertained interests become ascertained. Furthermore, lower courts can contribute to the clarification of many situations by refusing to permit, except in rare cases, guardians and trustees ad litem to file exceptions or appeals.

Since most pre-act trust instruments refer in general terms to "income", that phrase must be interpreted as though the conveyor had expressly provided a definition of "income" as of the date of the creation of the trust, i.e., as including corporate distributions based upon earnings irrespective of form when they reach the trustee. All of these trusts were created under the impression that the then "known certainty

of the law is the safety of all" and that the then prevailing definition of "income" would apply throughout the lives of the trusts. To change the definition by taking all corporate distributions other than cash dividends away from the life tenants and giving them to the remaindermen would violate vested rights not only of the life tenant, but also of the conveyor himself. Like all rules of distribution, the rule of apportionment is based upon the doctrine of cujus est dare ejus est disponere, i.e., "that a benefactor . . . has an individual right of property in the execution of the trust, and to deprive him of it would be a fraud on his generosity. To appropriate a gift to a purpose or person not intended, would be an invasion of the donor's private dominion": Holdship v. Patterson, 7 Watts 547, quoted in Borsch Estate, 362 Pa. 581, 586, 587. See also Girard Will Case, 386 Pa. 548. The correlative principle is that the interests of both life tenants and remaindermen in a trust vest and become fixed when a decedent or settlor creates the trust and that these interests cannot be constitutionally extinguished: Warden Trust, 382 Pa. 311, 315.

In Borsch Estate, supra, the court refused to apply the retroactive provisions of the Act of June 1, 1945, P. L. 1337, to spendthrift trusts and held, inter alia, that the doctrine of stare decisis is recognized and applied by the courts of this Commonwealth, and that a rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice. Such a showing has not been made here. On the contrary, the recent history of the law of equitable apportionment plus the evils of inflation have placed many life tenants in most unenviable positions. Until the rule was abolished by the legislature in 1945, it was always considered eminently fair and equitable because the

life tenant was always considered the favorite of the testator's bounty, in fact, every effort was made to augment his share. Knox's Estate, 328 Pa. 177, involved a wasting asset corporation wherein the life tenant of the trust was held entitled to all dividends based upon surplus earnings that had been added to paid in surplus as a depletion reserve. In Nirdlinger's Estate No. 2, 327 Pa. 171, the life tenant was held entitled to apportionment of the proceeds of the sale of salvaged real estate at less than inventory value, the philosophy being that the life tenant should not starve while the remaindermen feasted. Instead of their now being the favorites of the conveyor's bounty, they are today the victims of court decisions, while remaindermen, who are most remote in the scheme of distribution, have become preferred. Such unjust enrichment should not be extended.

Before the alleged unworkability of the doctrine be accepted as a valid cause for the complete abolition of apportionment, we should make sure that that is a reason and not an excuse for such extreme measures. Pennsylvania law reports demonstrate that there has been no indisposition by any court to cope with the doctrine. Confusion in applying vexatious principles of law are inherent throughout the judicial process. The lists of many courts throughout the country are clogged with negligence and other types of cases; the jury system, both civil and criminal, has been called unworkable; in many will-construction cases testators' intentions have been so muddled that courts have been at a loss to apply the proper canon or canons of construction. Numerous other harassing situations could be cited. However, no court in any such instance has ever gone to the extent of retroactively abolishing legal or equitable doctrines or procedures or suggesting the repeal of the Wills Act. The shocking prevail-

724

ing divorce rate and other marital scandals are no valid reason for abolishing monogamy. The present problem represents a passing phase and does not warrant the drastic action proposed. It is respectfully submitted that there are many who believe that the law of apportionment is workable although most intricate, vexatious and difficult to apply.

Examination of many of the pertinent decisions prompts the thought that undue attention has too often been riveted upon the many diverse and complex fiscal policies and accounting procedures of the corporations whose stocks are involved, in consequence of which intentions of the creators of the particular trusts have received inadequate attention. This inadvertence has, in my opinion, led to a confusion of the separate areas of law and of fact and of the often divergent jurisdictions of law and of equity. One salutary observation will illustrate the point. The basic premise in the application of equitable apportionment is that intact value is prima facie or presumptively book value. Harvey Estate, 395 Pa. 62, is a refreshing reminder. This was no doubt because book value, although widely variable, was the most convenient, but not the only approach. It was intended as a prelude to a finding of fact in each case and not to be a fixed principle of law. However, there has now emerged from the layer upon layer of decisions the present fixed and legal definition of intact value as being book value. The result is that "presumptively" and "prima facie" have disappeared from the definition; the word "equitable" consequently disappeared from the phrase "equitable apportionment." The rule of law that book value must be intact value in every case has, therefore, placed the application of the rule in a legal straitjacket and foreordained the doom not merely of the workability of the rule, but of the rule itself. Book value is such a variable that it is im-

possible to apply it strictly in every case with equity and justice because of the innumerable varying corporate fiscal policies and accounting practices. It follows that no standard or footrule can be premised upon it or that any formula employing it will serve as the universally sought guide to enable trustees to function efficiently, promptly and equitably. The initial step is to restore book value to its proper position in the determination of intact value, whether we term such value "real", "actual" or "intrinsic", as a mere presumption. While market value in the case of trustee-purchased stock as determined in Arrott Estate, 383 Pa. 228, should be considered, there is another more preferable value, inventory or account value, which is the value fixed by the settlor of a trust when he deposits the funds with the trustee, and by the court when awarding the assets to the trustee in the adjudication of the executor's account. This value is generally binding upon all parties to the trust who are also the only parties in interest in apportionment cases, except strikingly in the latter cases. All trust administration and accounting are based upon it, including taxes, commissions, counsel fees and oftentimes surcharge. It is so important, especially in cases of conveyor-owned stock, I would suggest that this value be accepted as prima facie in every case and that the burden rest upon the remaindermen to prove otherwise.

In the instant case, the adjudication does not award the small stock dividends to the life tenant without apportionment, although it might have done so. Instead, an apportionment was directed, but did not provide a directive for the application of the rule. The necessity for establishing such a formula is clear. Such a modus operandi was suggested by Judge Saylor and modified by President Judge Klein in Cun-

ningham Estate and Harvey Estate, 13 D. & C. 2d 63. It has the virtues of being consistent and workable and I am reliably informed that, although it would not do complete justice in every case, it should lead to a solution in about 95% or more of the cases. Law and equity seldom attain perfection and it is futile to try to split every penny. The objective is workability and every case is practically sui generis: Harvey Estate, supra. While this court's decision in Cunningham Estate was overruled by the Supreme Court, the sole reason for reversal was that the form of the corporate distribution did not constitute one of the four established apportionable events. Therefore, the formula given in the lower court opinion remains undisturbed. It was therein held that income beneficiaries are entitled to receive only so much of the earnings of corporations as (a) were earned subsequent to the acquisition of the stocks by the trustee; (b) have been capitalized to support the issue of the stock dividends; (c) the retention of which by the trustee is not required to preserve intact value; and lastly, that the stock when received by the trustee shall be valued on the basis of market value as of the date of receipt. The distribution to the life tenant should not depend upon the form of the corporate action or upon the decision of the trustee to sell or to retain the stock. Since confusion has been created by the use in (b) of the phrase "have been capitalized", I would suggest that (b) be amended to read as follows: "(b) the number of dollars taken out of earnings to support the dividend, no matter to which corporate account those dollars are transferred"; also that (c) be amended to read as follows: "(c) the retention of which by the trustee is not required to preserve intact value, which shall presumptively be account or inventory value on conveyor-owned securities and purchase price on trustee-acquired securi-

ties." Thereupon, when application of the rule is raised in orphans' courts upon the filing of partial accounts, findings of fact within the framework of the established four apportionable events and of the foregoing suggested formula should be made in the adjudication. Such findings should not be reversed on exceptions or on appeal except for palpable abuse of discretion. In Levy's Estate, 333 Pa. 440, it was held that apportionments of carrying charges on unproductive real estate between life tenant and remaindermen do not call for the employment of a fixed principle, but require . . . "the exercise of a sound discretion by the court of first instance and we will review only where there has been a palpable abuse of discretion." See also Crawford Estate, 362 Pa. 458, 467. Judge Lefever, speaking for this court in Bamberger Estate, 20 D. & C. 2d 394, 401, 402, said:

". . . It would seem that the rule of law to be distilled . . . is that apportionment among successive life tenants of items apportionable to income under the Pennsylvania rule of apportionment lies generally within the broad discretion of the orphans' court. The exercise of that discretion will not be reversed except for 'abuse of power'."

For these reasons I disagree with President Judge Klein and recommend that the Supreme Court should not sustain the retroactive provision of the Principal and Income Act by reversing its prior decisions.

*Sur Concurring Opinion*

SHOYER, J., December 19th, 1960.

I concur in the result of the majority opinion. I note that I am on record as favoring the application of the Uniform Principal and Income Act to all securities acquired after the effective date of this Act regardless of when the trust commenced. See Warden Trust, 4 Fiduc. Rep. 225; 382 Pa. 311.