## Romberger's Estate

Before Van Dusen, P. J., Stearne, Klein, Bolger, and Ladner, JJ.

The facts appear from the following extracts from the adjudication of

VAN DUSEN, P. J., auditing judge.—This account was called for audit March 4, April 1, May 15, and May 22, 1940. . . .

An objection to the account was made by counsel for Mary E. Evans, the life tenant, and Effie Evans Kissinger and Helen Evans Kern, remaindermen, that the whole fund of $25,000 was invested in a one-third interest in a mortgage of $75,000 upon premises 123-25 North Fifth Street, Philadelphia. The other shares of this mortgage were taken for two other trusts under this will, each of $25,000, viz, no. 44, the trust for Edith Romberger, and no. 46, the trust for Susan Romberger. Counsel cites the A. L. I. Restatement of Trusts, §228:

"Except as otherwise provided by the terms of the trust, the trustee is under a duty to the beneficiary to distribute the risk of loss by a reasonable diversification of investments, unless under the circumstances it is prudent not to do so."

And also Comment (h):

"If a breach of trust consists only in investing too large an amount in a single security or type of security, the trustee is liable only for such loss as results from the investment of the excess beyond the amount which it would have been proper so to invest."

The difficulty arising from the vagueness of both of these statements, and particularly the difficulty of determining how much should be invested in a particular security, has been ingeniously solved by counsel by demanding only the minimum of diversification, viz: that there

should be at least two items. If there is but one item, it is argued that half of it is improper, and if it fails then the trustee should replace one half of it with cash.

The decision in Elkins' Estate, 20 D. & C. 483, affirmed by the Supreme Court, 325 Pa. 373, which held to the contrary of the Restatement, disposes of the question. The principal topic of the opinion of the Supreme Court, it is true, is the right to review; but the court also considers the merits, as Judge Holland had done at length, and expresses agreement with his conclusion.

The request for surcharge with respect to one half of the investment of $25,000 in the mortgage at 123-25 North Fifth Street is refused.

The next objection by the life tenant is that the trustees were negligent in their efforts to sell this property after it was foreclosed. I suppose that the trustees' first thought was to try to keep the property occupied and in good condition and productive, and that they knew so well that it was unsalable that they did not go through the motions of trying to make a sale as specifically as they might have done.

I find that when this property was placed in the hands of Barber, Hartman & Company in 1932, and in 1934 in the hands of Lanard & Axilbund, these brokers were given a sale price of $85,000, which was based on an appraisal of $80,000; that it was understood by these brokers from this fact and from the general circumstances that the property was for sale; further, that explicit instructions with regard to sale were given to Lanard & Axilbund by Mr. Clarke of the Provident, who discussed the matter of sale with them from time to time; that they were told to submit any reasonable offer and that no offer was ever made.

I find that these agents, particularly Lanard & Axilbund, are specialists in this kind of building. I have examined the building and the neighborhood myself. It is a loft building for light manufacturing, somewhat old-fashioned, and in a decaying neighborhood. It is six

stories, with six tenants, and a common elevator, stairway, heating system, sprinkler system, etc. The best thing that the trustees could have done was to put the property in the hands of these agents. It has produced only $3,700 of net income in seven and a half years, and that is subject to some adjustments as will appear hereafter. I find that the property is unsalable at the present time, and that the trustees did all that they reasonably could have done to find a purchaser.

There seems to be no complaint of improper management with respect to gross or net revenue. Counsel for the life tenant in his brief claims for his client four percent on $57,000 from January 1937, for lost revenue. The theory is that the property could have been sold by that time; but there is no evidence to support this claim, and I find to the contrary. The figure of $57,000 appears to be the assessment for 1937. I find that neither that figure, nor any other which can be stated, represents the sale value of the property at that time or any other time.

Counsel for the life tenant also objected to credits for "rental agents' commissions" appearing on pages 16 to 52, inclusive, in that part of the account marked "Exhibit", and totaling $1,951.10. It should be said that the operation account of this building is attached to the account and is called "Exhibit". This exhibit is expressed in figures applicable to the whole enterprise, of which this estate owns one third. It is identical with the exhibit attached to the accounts in nos. 44 and 46, which concern the other two thirds of the same mortgage. I find that these commissions were paid to Barber, Hartman & Company down to 1934, and thereafter to Lanard & Axilbund. Upon acquiring title to the building by foreclosure, and indeed, for a few months prior thereto, the accountants collected the rents, employing these agents for that purpose, and also for the purpose of managing the building and securing new tenants if possible. When possession was taken, floors nos. 1 and 2 were vacant, and they so remained until 1934, when Lanard & Axilbund were

employed. They soon rented these two floors, and have kept the building occupied substantially all the time. The tenants in the three top floors have continued the same since possession was taken. The agents, however, have collected the rents from these tenants. Lanard & Axilbund specialize in such buildings as this and they are in constant touch with prospective tenants. I find that the employment of such an agent was necessary to the proper management of the building, that failure to do so would have been negligence, and that the commission of five percent paid to them was proper compensation: Kern's Estate, 29 D. & C. 71. If the agents were to manage the whole building and be responsible for tenancies in the whole building, it was proper to put in their hands collection of all the rents in order that they might be adequately compensated. That is the usual way of compensating real estate agents.

Adequate services cannot be obtained without adequate compensation. It is argued that because one of the trustees is a corporation, which has a department which collects rents (which department, no doubt, costs something to maintain) then this department must act for all the trustees in the collection of rents in the management of specialty buildings. I do not see why. That one of the trustees is a corporation makes no difference, and indeed, it makes no difference that under the will these trustees get only three percent on all the income of the trust, instead of the usual five percent. There may be cases in which trustees must collect rent themselves. But in most cases business men find it advantageous to employ rental agents—otherwise such rental agents would not exist. When the duty of the agent includes management of such a building as this, occupied by several tenants, it seems to me that the trustees are in duty bound to see that the trust has the advantage of such services, and that it is not bound to perform and should not try to perform the services itself.

The request for surcharge with respect to commissions paid to rental agents is refused. . . .

The life tenant complains of the charge to income of interest on overdrafts; that is to say, money advanced to the trust by the Provident Trust Company, one of the trustees. A trustee is not bound to advance such money, but if it does there is no reason why it should not be compensated. The money advanced was used for the benefit of the trust, and the trustee is entitled to use its judgment as to whether it is advantageous to the trust to advance money to pay taxes, or to let penalties accumulate; whether it is advantageous to advance money for a new roof, or to let the roof fall in. Any sum which the trustee is kind enough to advance and which is necessary to the administration of the trust is a proper sum on which to charge interest: Kern's Estate, 29 D. & C. 71; Adamson's Estate, 30 D. & C. 476. Objections were made specifically to the charge of interest on overdrafts caused by payment of taxes, maintenance and repairs, payments to life tenants, interest on overdrafts and trustees' commissions. All of these should be paid in cash, and if the trustee sees fit to advance the cash then it is entitled to interest thereon.

From this, however, interest on interest should be excepted. The refusal to allow compound interest runs all through the law (33 C. J. 191), and I think that it applies to this case as well as to any other. It is one of the unpleasant features of being a trustee that if you are able and willing to advance money to a trust which is as nonliquid as this one, you may have to wait some time for both principal and interest. I, therefore, disallow so much of the interest on overdrafts as represents interest on interest unpaid. The calculation of the result can be presented in the schedule of distribution.

I find that the interest on principal overdrafts was $882.33, on income overdrafts exclusive of advances to life tenant $305.29, on advances to life tenant $1.67. This

sum of $1.67 should also be excepted: Kern's Estate, supra; but it is de minimis.

The objection to the charges for interest on overdrafts is dismissed except with respect to interest on interest, as to which it is sustained. . . .

*Barnet Lieberman*, for exceptants.

*Rambo & Mair* and *Robert W. Archbald, Jr.*, contra.

STEARNE, J., December 6, 1940.—Decedent, possessed of a large estate, died leaving a will containing 37 items and with two codicils thereto, and wherein he created certain trusts. The trustees have filed accounts relating to the administration of these trusts. Exceptions have been taken to eight of the adjudications. It would be unnecessary duplication to deal separately with each set of exceptions. They will be disposed of collectively.

The principal exception concerns the failure of the trustees to diversify investments. The investments having proven unfortunate, exceptants maintain that loss would have been avoided, or lessened, had the trustees diversified the investments. They seek to surcharge the trustees with the loss. The auditing judge declined to surcharge and relied upon Elkins' Estate, 20 D. & C. 483, affirmed by the Supreme Court in 325 Pa. 373, 376. Since the argument the ruling of the auditing judge has been approved by the Supreme Court in Saeger's Estate, 340 Pa. 73, 1940. Mr. Justice Patterson in his opinion approves the language of Judge Holland in Elkins' Estate, supra. It is, therefore, unequivocally settled that the doctrine of diversification of trust investments does not form part of the law of this Commonwealth. However, in a case where the *sufficiency* of an investment is questioned, the fact that the entire trust res was invested in one security may constitute an element in determining whether the fiduciary acted with common skill, common prudence, and common caution: Murgitroyde's Estate, 32 D. & C. 155, 159; Connell's Estate, 32 D. & C. 20, 24. As the investments were conceded to be proper

and adequate when made, the trustees will not be surcharged merely for failure to diversify.

Another set of exceptions relate to the trustees' alleged failure to liquidate, with reasonable promptness, unproductive or underproductive real estate. Such real estate unquestionably must be sold with reasonable promptness: A. L. I. Restatement of Trusts §210. However, there is a finding of fact by the auditing judge that the trustees have used due diligence under all the circumstances in attempting to dispose of such real estate. Such finding is supported by the testimony. We discover no manifest error or unwarranted conclusions by the auditing judge. Such finding, therefore, will not be disturbed by the court en banc:. Kaufmann's Estate, 281 Pa. 519; Houston's Estate, 318 Pa. 300; Jacobs' Trust Estate, 320 Pa. 539; Byrnes' Case, 325 Pa. 445.

For the reasons assigned and the cases cited by the auditing judge, we see no impropriety in the employment, by the trustees, of expert real estate agents, to collect the rentals and manage two multiple-tenant buildings, one of which was a six-tenant factory building. Such real estate, being of special character, required skilled and competent service, which any fiduciary would normally be unable to render. We decline to disturb the auditing judge's findings and conclusions with respect thereto.

We agree with the auditing judge that, under the authority of Kerns' Estate, 29 D. & C. 71, a fiduciary is entitled to receive interest on advances or loans made for carrying charges and improvements, but not for advances on income distributions. The auditing judge has amply elaborated upon this queston.

Considerable testimony was taken as to allocation as between principal and income of carrying charges upon unproductive or underproductive real estate held by the trustees, either as mortgagees in possession, or pending liquidation foreclosure. As there is no other fund, except out of rentals, with which to pay such carrying charges, all expenditures necessarily must come out of this com-

mon fund, or from voluntary advancements made by the trustees. Until the real estate is actually sold, and a fund is before the court for distribution, there exists no completed salvage operation. Under such circumstances, decisions relating to questions of allocation as between income and principal are mostly premature. This accounting is therefore solely to verify actual receipts and disbursements of such items. When the salvage operation is finally completed, and upon an accounting when there is a fund before the court for distribution, the parties may then appear and make application for equitable allocation of the funds as between income and principal: Nirdlinger's Estate (No. 2), 327 Pa. 171. Confirmation of the present accounts, as respects such items, merely approves the actual receipts and expenditures, and is not intended to preclude the parties from subsequently having the fund allocated as above indicated. This right is expressly reserved to them. See Bullitt's Estate, 308 Pa. 413, Neafie's Estate, 325 Pa. 561, and Mark's Estate, 2598 of 1932, opinion of Klein, J. (not reported).

Exceptions are taken to the ruling of the auditing judge concerning his refusal to grant a rehearing in order to seek to surcharge trustees, where the trust res was invested in a participating certificate, or share, in a first mortgage; no objection is made to the character and sufficiency of the investment, or to the trustees' management; the request for surcharge is based solely upon the trustees' failure to file an account when the cestui que trust became of age on October 9, 1934, and to then make distribution by the transfer to him of such security in kind; and this where the beneficiary, since his majority, has never made a demand for an accounting, but has been regularly receiving the income from the trust, when and as paid.

For the reasons set forth in the adjudication we agree that the ruling of the auditing judge, in refusing such rehearing, under such circumstances, was clearly correct.

All exceptions are dismissed and all of the adjudications herein referred to are confirmed absolutely.